[No. 47153-3. En Banc. July 23, 1981.]

KIRBY L. ALLEN, ET AL, *Petitioners,* v. AMERICAN LAND RESEARCH, ET AL, *Respondents.*

*Roger M. Leed* and *David A. Bricklin,* for petitioners.

*William M. Robinson* and *Edwards & Barbieri,* by *Charles K. Wiggins* and *Malcolm L. Edwards,* for respondents.

*Kenneth O. Eikenberry, Attorney General, Thomas L. Boeder, Senior Assistant,* and *James M. Beaulaurier, Assistant,* amici curiae for petitioners.

DORE, J.—Petitioners, plaintiffs below, seek reinstatement of the trial court's judgment. For the reasons stated below, we reverse the Court of Appeals and reinstate the trial court's judgment.

At all times pertinent to this suit, Mr. and Mrs. Myers, Mr. and Mrs. Jacoby and the corporations American Land Research and Federated Land Research were California residents. They, along with others, were defendants, but we distinguish them in this opinion by designating them "California defendants". All California defendants but Mr. and Mrs. Jacoby are respondents before this court.

Alexander Myers and David Jacoby collaborated in writing a book entitled "Think Land—Think Money" (TLTM). They offered the book for sale to the public in Washington. Among other things, TLTM strongly advocated the purchase of undeveloped desert land in Southern California as a safe and prudent investment and represented that persons buying such land would probably realize a high profit at a low risk. Myers and Jacoby created and controlled two California corporations, American Land Research (ALR) and Federated Land Research (FLR). These defendants owned desert land in Southern California which was virtually worthless. Myers and Jacoby devised a scheme to sell that land to Washington residents.

TLTM was advertised in Washington; local purchasers ordered the book from California through the mail. Names of the Washington residents who ordered the book were forwarded by California defendants to ALR agents in Washington. These agents were real estate brokers licensed to do business in Washington pursuant to RCW 18.85, "Real Estate Brokers and Salesmen" (the Brokers Act). The Washington agents were under the direct supervision and control of the California defendants. The land sales promotion included furnishing copies of TLTM to the Washington agents. The Washington purchasers of TLTM were contacted at their homes where they received substantially identical prerehearsed sales presentations from the agents of the California defendants. As part of the sales promotion, it was the Washington agents' practice to inquire whether the prospective purchaser had read TLTM. Approximately 200 Washington residents paid in excess of $2 million to defendants for nearly worthless California land.

Kirby Allen brought suit on behalf of the Washington purchasers against the California defendants alleging common law fraud and violations of the Washington Consumer Protection Act (CPA), RCW 19.86, and the Federal Interstate Land Sales Full Disclosure Act (15 U.S.C. §§ 1701–20). The class was certified and the case proceeded to trial. All but one of the Washington real estate brokers and salesmen who had been named as defendants reached a settlement with the plaintiffs prior to trial.

A 3–month trial culminated in a judgment for named plaintiffs on a common law fraud theory, and judgment for the class on its claims alleging violations of the CPA. Insufficient evidence was produced to prove the violations of the federal act. The trial court found that much of the illegal activity involved was the extensive use of the book "Think Land—Think Money". The claims against the one Washington defendant who went to trial were dismissed for lack of evidence to support liability.

The trial court ordered that California defendants

deposit $250,000 in a trust fund for the benefit of the class, and directed restitution. Defendants never sought a supersedeas bond but appealed the judgment. Myers was ordered to appear for postjudgment proceedings. Defendants were found in contempt by the trial court for failing to establish the trust fund and Myers was found in contempt for failure to comply with postjudgment procedures. The question of the validity of the contempt orders was consolidated with the direct appeal. The Court of Appeals reversed the trial court. *Allen v. American Land Research,* 25 Wn. App. 914, 611 P.2d 420 (1980). Noting that the fraud perpetrated by defendants was "amply supported by the record", *Allen,* at 916, the Court of Appeals concluded "[w]ith great reluctance", *Allen,* at 917, that the acts of defendants were exempt from the reach of the Consumer Protection Act. The contempt orders, which were predicated on the judgment, were reversed as well.

## Consumer Protection Act

All acts complained of occurred before 1974. Prior to 1974, the Washington Consumer Protection Act contained an exclusion which read as follows:

> Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington public service commission, the federal power commission or any other regulatory body or officer acting under statutory authority of this state or the United States . . .

Laws of 1967, ch. 147, § 1, p. 710. Defendants contend that their acts, regardless of their proven wrongfulness, are not subject to the Consumer Protection Act because they fall within the above quoted exemption by virtue of the defendants' utilization of licensed Washington real estate brokers to consummate the sales. Because such brokers are regulated by the Brokers Act, defendants' activities were "regulated . . . by . . . [a] regulatory body or officer acting under statutory authority of this state . . ."

We agree with respondents that the activities of their

Washington agents were exempt from the CPA due to their regulation under the Brokers Act. The California defendants, however, were not so regulated. We hold that the legislature did not intend that this CPA exclusion be given so liberal a construction as to allow scores of Washington residents to be deceived and defrauded without recourse by California residents.

There are two inquiries which determine the applicability of the cited exemption: first, is there a "regulatory body" involved and second, is the transaction "permitted, prohibited or regulated".

To satisfy the first requirements, an agency must do more than merely monitor the business practices of those who are in the area; the entry into that area must also be controlled. *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 501 P.2d 290 (1972). The Brokers Act clearly controls entry into the occupation of selling real estate. The provisions of that act cover licensing of brokers, and require brokers and salespersons to conform to certain standards and code of conduct in order to maintain those licenses. But for those who are not licensed, the Brokers Act obviously does not act as a regulatory agency. There was no way for the Director of Motor Vehicles (Director), who enforces the Brokers Act, to stop and/or regulate Myers' activities, whether Myers' acts took place in Washington or in California.

Respondents have failed to show that *their* activities were prohibited or regulated. Even if a business is generally regulated, the specific activity complained of must be subject to regulation to come within this exemption. *Dick v. Attorney General*, 83 Wn.2d 684, 521 P.2d 702 (1974). Although the distribution of false materials and participation in misrepresentations or fraud were prohibited under the Brokers Act, *see* RCW 18.85.230, these regulations did not apply to anyone but the Washington real estate brokers and salespersons. The California defendants were free to distribute their book and any other misleading promotional material with impunity, as far as the Brokers Act was concerned. If the Washington brokers with whom Myers asso-

ciated had been enjoined by the Brokers Act, Myers could have associated new Washington agents and made more sales. If those agents were subsequently stopped by the Director, Myers could have found still another Washington agent to consummate additional sales. This ability to leapfrog with the Brokers Act discloses the weakness in respondents' argument that the California defendants' activities and transactions were regulated.

As noted above, the Washington brokers and salespersons were regulated by the Brokers Act. We heard and considered respondents' arguments that their activities cannot be separated from the sale of the realty. They contend that the California defendants made no direct representations to any plaintiff after 1968, and without such individual contact, the respondents' acts were merged within the ultimate sale made by the licensed (*i.e.*, regulated) broker. We reject this argument in light of policy reflected by federal law and the trial court's unchallenged findings of fact.

 Our Consumer Protection Act provides:

It is the intent of the legislature that, in construing this act, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters . . .

RCW 19.86.920. It has long been held under federal law that one may not escape liability by putting into the hands of another the means and instrumentalities by which to defraud others. *FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494, 66 L. Ed. 729, 42 S. Ct. 384 (1921) ("That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has long been a part of the law of unfair competition."); *Regina Corp. v. FTC*, 322 F.2d 765 (3d Cir. 1963); *Waltham Watch Co. v. FTC*, 318 F.2d 28 (7th Cir. 1963); *Irwin v. FTC*, 143 F.2d 316 (8th Cir. 1944).

It is true that the trial court found December 31, 1968, to be the date *before which* Myers made sales presentations. This finding, however, does not affirmatively state that Myers' activities ceased on that date. To so hold, we would

have to disregard other findings; for example, that Myers, ALR and FLR maintained an apartment in Seattle from 1968 to 1972 in which sales literature was stored and from which prospective purchasers were solicited. In addition, respondents, through TLTM, wrongfully held themselves out to purchasers as having expertise in land investment, and as being qualified investment counselors. They also were found to have a conflict of interest by advising others to purchase land which they owned without disclosing so salient a relationship. Respondents failed in their duty as "investment counselors" to disclose material facts regarding the realty for sale and of which they were aware. TLTM contained

> unfair, deceptive and untrue representations . . . [which] were of existing material facts, and were false when made. They were made by defendants with knowledge of their falsity, and with the intent that Washington purchasers should rely on such statements. The plaintiffs . . . did rely on such statements, were ignorant of their falsity, and were entitled to so rely, and were damaged as a result because they were induced by such statements to purchase California Realty from defendants.

Finding of fact No. 56. Furthermore, the conclusions of law establish that "defendants" violated the CPA. We will not go behind these unchallenged conclusions and hold that the trial court intended for the respondents to be excluded from the term "defendants". The record before us is replete with references to illegal activities which are separable from the ultimate act of the sale of the realty. Actions taken by respondents prior to the actual sales were not regulated by the Brokers Act, and gave rise to liability under the CPA. The exemption may protect the sale itself from the CPA, if made through the licensed broker. But this has no effect on the presale wrongs. *See Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 581 P.2d 1349 (1978). The California defendants' acts were not "prohibited or regulated" by the Brokers Act.

### CONTEMPT ORDERS

The trial court issued two contempt orders against defendants. The first was based on defendants' failure to establish the trust fund as required by the trial court judgment. The second involved Myers' failure to appear for postjudgment supplemental proceedings. The trial court gave defendants ample opportunities to purge the contempts. Defendants chose, instead, to totally disregard the trial court orders, and to appeal their case to the Court of Appeals. No supersedeas bond was ever filed.

Due to its reversal of the underlying judgment, the Court of Appeals reversed both contempt orders. Because we are reinstating the trial court judgment against defendants, we will not comment on whether the Court of Appeals erred in striking the contempt orders upon the failure of the underlying judgment.

■ The validity of the contempt orders turns on whether the trial court had jurisdiction to enter the orders. In *Dike v. Dike,* 75 Wn.2d 1, 8, 448 P.2d 490 (1968) we quoted, with approval, the following from *Robertson v. Commonwealth,* 181 Va. 520, 537, 25 S.E.2d 352, 146 A.L.R. 966 (1943).

> [T]he authorities are in accord that where the court has jurisdiction of the parties and of the subject matter of the suit and the legal authority to make the order, a party refusing to obey it, however erroneously made, is liable for contempt.

In *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 87 Wn.2d 327, 553 P.2d 442 (1976), we discussed the court's inherent power to issue contempt orders. That case also involved violations of the Washington Consumer Protection Act. The violators had been given 15 days to place $142,000 into a trust account and failed to comply. The court had also ordered the violators to appear for an examination of their property and they failed to appear at the ancillary proceedings. The opportunities given to purge the contempts were not taken. No supersedeas bond was filed. We cannot help but note the marked similarities between *Wil-*

*liams* and the case before us.

We find in the subject case, as we did in *Williams,* that the trial court had the power to enter the order concerning restitution. Therefore, the defendants had no basis for failing to establish the trust fund as ordered. A court has the inherent power to issue a contempt order for the purpose of trying to force compliance with its judgment. *Keller v. Keller,* 52 Wn.2d 84, 323 P.2d 231 (1958). The filing of the appeal did not act as a bar to the trial court to enter the second contempt order nor did it prevent that court from holding additional proceedings to aid in enforcement of the judgment. *Williams, supra* at 331. A supersedeas bond would have stayed further proceedings in the superior court. *Arnold v. National Union of Marine Cooks,* 42 Wn.2d 648, 257 P.2d 629 (1953). Having failed to do this, defendants cannot now argue that the contempt orders were erroneously entered.

██ The Court of Appeals also found that the second contempt order failed, regardless of the validity of the underlying judgment, because of failure to comply with RCW 6.32 which provides for proceedings supplemental to execution. We do not agree. We view the supplemental proceedings here as ancillary to the original suit. The court had continuing jurisdiction over the parties here by virtue of the original summons, process and appearances in the action. *See Arnold v. National Union of Marine Cooks, supra.* The judgment unmistakably reserves to the trial court continuing jurisdiction for the purpose of enforcing the judgment. The record shows that defendants' Washington counsel received actual notice of these proceedings. No additional notice was necessary. The ancillary proceedings in the subject case were not the

> normal supplemental proceedings [wherein] the prevailing party only seeks to discover the other party's property in order to satisfy a judgment. The proceedings in this case were conducted contemporaneously with and in aid of respondent's efforts to obtain compliance with the order of restitution authorized by RCW 19.86.080. RCW

19.86.080 permits the trial judge to "make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property." Such authority is broad enough to comprehend ascertainment of appellants' current assets and determine whether they are in possession of property sufficient to comply with the restitution order. The restitution order sets up an efficient procedure to effectuate the return of consumer property in appellants' unlawful possession. . . . [T]he ancillary proceedings stand in pari materia with enforcement of the restitution order and, with actual knowledge thereof, continuing jurisdiction over appellants arising from the case in chief remains.

(Footnote and citation omitted.) *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 87 Wn.2d 327, 334, 553 P.2d 442 (1976).

The respondents have urged us not to reinstate the trial court judgment even if we reverse the Court of Appeals, because of alleged errors by the trial court in fashioning the remedies. The Court of Appeals had this to say on the issue:

Although we do not further address the issue in this proceeding, we note that the trial court granted the relief of rescission in this private action although [RCW 19.86-.090] authorizes only an action to enjoin further violations and to recover "actual damages." *Cf. Johnston v. Beneficial Management Corp. of America,* 85 Wn.2d 637, 538 P.2d 510 (1975) and *Hockley v. Hargitt,* 82 Wn.2d 337, 510 P.2d 1123 (1973).

The remedy of rescission is authorized only by RCW 19.86.080 which grants other and broader powers to the Attorney General.

*Allen v. American Land Research,* 25 Wn. App. at 921 n.5. Respondents rely on federal case law interpreting the Federal Trade Commission Act, 15 U.S.C. §§ 15, 26, upon which, they claim, the private remedy section of our state CPA is based. They argue that the legislature could have authorized, but failed to, a right of action for rescission and restitution along with its creation of a damage action. Citing the Restatement of Contracts § 384 (1932), they assert that damages and restitution are alternative remedies.

Petitioners answer that rescission is available under the CPA and was necessary to effectuate the court's judgment. They argue that rescission is a proper remedy under contract law for the seller's commission of a material breach in a land sale contract. D. Dobbs, *Remedies* § 12.9 (1973). Because the findings establish such breach by the California defendants, petitioners contend that the trial court was entitled to order rescission on grounds independent from the Consumer Protection Act.

Petitioners additionally argue that "damages" means the compensation which the law will award for an injury, *State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 111 P.2d 612 (1941). The trial court merely used restitution (funds paid by plaintiffs to defendants plus statutory interest) as the measure of damages. The court has wide discretion in determining the measure of damages. *Edwards Contracting Co. v. Port of Tacoma,* 83 Wn.2d 7, 514 P.2d 1381 (1973).

Finally, petitioners assert that in *Hockley v. Hargitt,* 82 Wn.2d 337, 510 P.2d 1123 (1973) we held that a plaintiff in a private action under the CPA is entitled to equitable or injunctive relief and is not restricted to damages. They also cite *MacCormack v. Robins Constr.,* 11 Wn. App. 80, 521 P.2d 761 (1974) for the proposition that the legislature never intended to provide an exclusive remedy under the CPA.

We find no error by the trial court's award of rescission and its determination of damages. We have recognized the need for broadened private remedies under the Consumer Protection Act. *Hockley v. Hargitt, supra.* The superior court's inherent authority to enforce orders and fashion judgments is not dependent on the statutory grant. Even if we were to hold that rescission was improper, we cannot say that the trial court's determination of the measure of damages, after extensive hearings on the issue, was in error.

The case is reversed and remanded to the trial court with orders to reinstate the judgment in its entirety and proceed

with enforcement of that judgment, as provided therein.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, HICKS, WILLIAMS, and DIMMICK, JJ., concur.

Reconsideration denied December 7, 1981.