[No. 57235-6. En Banc. February 20, 1992.]

ROBERT ERIKS, ET AL, *Respondents,* v. WILLIAM JAMES DENVER, ET AL, *Appellants.*

*Mundt, MacGregor, Happel, Falconer, Zulauf & Hall,* by *Spencer Hall, Jr.,* and *Janet D. McEachern,* for appellants.

*Mikkelborg, Broz, Wells & Fryer,* by *Dexter A. Washburn; Pence & Dawson,* by *Christopher C. Pence,* for respondents.

UTTER, J. — The promoters of a tax shelter ·scheme hired attorney William Denver to provide joint legal defense for all investors and promoters in audits before the Internal Revenue Service (hereinafter IRS) and in tax court cases.

The investors later brought a class action suit against Denver alleging that he violated the former Code of Professional Responsibility (hereinafter CPR) by representing both investors and promoters in the tax shelter and that his representation of multiple clients violated the Consumer Protection Act. The investors moved for partial summary judgment and the trial court ruled as a matter of law that Denver's multiple representation of clients with conflicting interests violated the CPR. The court ordered Denver to disgorge all fees paid in conjunction with representing the class members plus prejudgment interest. The trial court ruled against the class on the issue of the Consumer Protection Act's application to Denver's multiple representation. The investors then moved to recertify the class. The trial court denied the investors' motion. Denver appealed and the class cross-appealed. We affirm all of the trial court's rulings and the order requiring Denver to disgorge all fees paid in conjunction with representing the class members, plus prejudgment interest.

In 1977, Cliff Johnston, Percy Goodwin, and others (hereinafter the promoters) began selling investments in master sound recordings as tax shelters. By 1981, the IRS was challenging the tax credits and deductions taken by the investors. The promoters then formed the Master Recording Trust Fund (hereinafter MRTF) to provide joint legal defense of the investors and promoters in the anticipated audits and tax court cases.

The promoters hired attorney William Denver to represent those who contributed to the MRTF. Denver shared an office and support staff with the promoters. The promoters solicited contributions to MRTF from investors, and eventually over 240 investors contributed approximately $400 each to the MRTF.

Prior to starting his work for the MRTF, Denver knew that the IRS was, as a matter of policy, automatically rejecting all tax credits and deductions based on investments in master sound recordings. Denver knew that every investor would be audited and believed that the credits and deduc-

tions would be disallowed. Both prior to and during his representation of MRTF clients, Denver knew of no such tax credit or deduction that had been allowed after an IRS audit.

At the time he undertook the MRTF representation, Denver knew that his investor clients potentially could have civil claims against his promoter clients. Denver discussed all his potential conflicts of interest with his promoter clients, but did not do so with his investor clients.

A tax court hearing was held in March 1983. Widespread title and appraisal problems with the master sound recordings were found. In spite of these problems, Denver continued to represent some of the MRTF members without advising them of their rights vis-a-vis the promoters. Denver later advised the MRTF investors to settle with the IRS and obtain independent legal counsel if they had questions about remedies that they might have against the promoters.

In 1985, the investors filed a class action suit alleging that Denver was negligent in his representation of them. The complaint also alleged that Denver's representation of both promoters and investors was a breach of his fiduciary duty to the investors and was an unfair or deceptive act under the Consumer Protection Act. The court certified the class under CR 23(b)(3). The court later denied defendant's motion to decertify the class and ordered the trial bifurcated into two phases, one phase to address issues common to all parties, the other phase to address all individual claims of negligence and malpractice.

In 1988, the trial court granted the investors' motion for partial summary judgment on the issue of Denver's alleged breach of fiduciary duty, ruling as a matter of law that by October 1981 there was an actual conflict of interest between Denver's investor clients and promoter clients. The judge then ruled that Denver's failure to disclose the conflict of interest to his investor clients violated former CPR DR 5-105, and that such a violation was a breach of Denver's fiduciary duty to his investor clients. The judge then ordered Denver to disgorge all fees paid in conjunction

with representing the class members, plus prejudgment interest.

The investors' motion for a summary judgment awarding them treble damages for violation of the Consumer Protection Act (hereinafter CPA) was denied, the trial court ruling that trebling the amount to be disgorged was not appropriate under the CPA. The investors then moved to recertify the class from a CR 23(b)(3) class to a CR 23(b)(2) class, arguing that disgorgement of fees was relief that was equitable in nature. The trial court denied the motion to recertify the class and ruled that it was improper to recertify the class after already granting affirmative relief. After the Court of Appeals certified the case to this court pursuant to RAP 4.3, we granted review of all three of the trial court's rulings.

I

■ ■ The first issue in this case is whether the trial court properly concluded that, as a matter of law, Denver violated the CPR.[1] Since the trial court decided this case on a motion for summary judgment, this court must view all of the facts and reasonable inferences from them in the light most favorable to the nonmoving party. *Wood v. Seattle*, 57 Wn.2d 469, 473, 358 P.2d 140 (1960). Summary judgment is appropriate:

> "if the pleadings, depositions, [answers to interrogatories,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985) (quoting CR 56(c)). A material fact is "one upon which the outcome of the litigation depends". *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980).

---

[1]The Rules of Professional Conduct replaced the Code of Professional Responsibility effective September 1, 1985. *See* Official Rules of Court (1985-1986). All of the allegations relating to Denver's conflict of interest are based on events that occurred in 1981 to 1983. Therefore, the CPR governs Denver's conduct.

Denver argues that it was improper to grant summary judgment in the face of two expert affidavits opining that his actions did not give rise to a conflict of interest.[2] Since an expert opinion on an "ultimate issue of *fact*" is sufficient to defeat a motion for summary judgment (italics ours), *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 352, 588 P.2d 1346 (1979), Denver's argument on this issue is based on the assumption that the determination of whether a conflict of interest exists is a question of fact. There are Court of Appeals cases that indicate that this determination is a question of law. In *Marquardt v. Fein*, 25 Wn. App. 651, 612 P.2d 378 (1980), an attorney was hired to represent a class of defendants against an action brought by the insurance commissioner. The attorney also represented other defendants who had different interests from the class members. The trial court found as a matter of law that the attorney had a conflict of interest. 25 Wn. App. at 656. The Court of Appeals upheld the trial court without any comment on the issue of whether the determination of whether the attorney violated the CPR was a question of law or fact. Later, in *Stroud v. Beck*, 49 Wn. App. 279, 742 P.2d 735 (1987), the Court of Appeals specifically held that the question of whether an attorney has breached his fiduciary duty to a client is a question of law. 49 Wn. App. at 288.

We have never addressed the question of whether the determination of a violation of the CPR is a question of law or fact. Since an attorney's fiduciary duty to a client arises from the same rules of conduct that proscribe an attorney from representing multiple parties with conflicting interests, it is logical to extend the holdings from *Marquardt* and *Stroud* to the determination of whether an attorney's conduct violates the relevant Rules of Professional Conduct. Thus, we hold that the question of whether an attorney's conduct violates the relevant Rules of Profes-

---

[2]Denver submitted affidavits from University of Puget Sound law professor David Boerner and Seattle tax practitioner Robert Kaplan.

sional Conduct is a question of law.[3] *See, e.g., Burnette v. Morgan*, 303 Ark. 150, 794 S.W.2d 145 (1990); *McCall v. District Court*, 783 P.2d 1223 (Colo. 1989); *Attorney Grievance Comm'n v. Korotki*, 318 Md. 646, 569 A.2d 1224 (1990); *State v. Romero*, 563 N.E.2d 134 (Ind. Ct. App. 1990); *Bonanza Motors, Inc. v. Webb*, 104 Idaho 234, 657 P.2d 1102 (Ct. App. 1983).

█ As a result of our holding, we decline to accept Denver's position. When a trial court is presented with a question of law, the court may properly disregard expert affidavits that contain conclusions of law. *Charlton v. Day Island Marina, Inc.*, 46 Wn. App. 784, 788, 732 P.2d 1008 (1987). *See State v. O'Connell*, 83 Wn.2d 797, 816, 523 P.2d 872, 77 A.L.R.2d 874 (1974) (the issue of whether an attorney must disclose his fee-sharing arrangements is a question of law and that expert opinion on the matter is therefore improper). Thus, the trial court was entitled to give as much weight as it thought proper, or no weight at all, to the affidavits. Summary judgment was not inappropriate because the affidavits did not express an expert opinion on "ultimate issues of fact."

█ CPR DR 5-105(A) and (B) are the rules at issue. Those rules require an attorney to refuse employment, or to discontinue multiple employment,

> if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under section (C).

CPR DR 5-105(B). CPR DR 5-105(C) allows multiple representation where (1) it is obvious the lawyer can adequately

---

[3]The court's holding today does not contradict the decision in *Halvorsen v. Halvorsen*, 3 Wn. App. 827, 479 P.2d 161 (1970), *review denied*, 78 Wn.2d 996 (1971). In *Halvorsen*, an attorney represented both parties in a property settlement agreement stemming from an uncontested divorce, but informed the parties of the potential conflicts of interest and advised them to seek independent counsel. *Halvorsen* should be read as holding that once the court determines as a matter of law that an attorney complied with the CPR, then whether the attorney's subsequent multiple representation is reasonable is a question of fact.

represent each client, and (2) each client consents to the multiple representation "after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment". The purpose of the CPR and the disciplinary rules is to protect the public from attorney misconduct. *In re McNerthney*, 95 Wn.2d 38, 41, 621 P.2d 731 (1980). We will construe the CPR broadly to achieve that purpose. *In re McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983). Thus, CPR DR 5-105 is interpreted broadly to protect the public from the evils of multiple representation of clients with potentially conflicting interests.

The Ethical Considerations (hereinafter EC) illustrate the problems inherent in such representation.

> If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients . . ..

CPR EC 5-15. That is exactly what happened in this case. After the IRS denied several investor clients' deductions, those clients asked Denver whether they had any legal recourse against the promoters. Denver's response was:

> I . . . made it quite clear . . . that they should obtain independent counsel if they wished to pursue any actions against other parties in this matter and I did not advise them as to possible recourse against the persons who sold them their Master Sound Recordings.

Respondents' Clerk's Papers, at 34. Thus the evil the rules were designed to prevent actually came about in this case. Denver could not advise his clients as to an appropriate course of action. His inability to properly advise his clients violated Denver's duty of loyalty to those clients. Model Rules of Professional Conduct, Rule 1.7 comment, at 73 (1984).[4] Both the investor and promoter clients were forced to obtain new counsel, with all the resulting hardships and expenses such actions inevitably entail.

---

[4]Although this comment is not part of the CPR, its reasoning applies equally to those rules.

■ The Ethical Considerations to the CPR make it clear the rules disfavor multiple representation anytime there is even a *potential* conflict of interest. CPR DR 5-105 applies not only when there is an actual conflict, but when the various clients' interest "*may*" be merely "inconsistent, diverse, or otherwise discordant." (Italics ours.) CPR EC 5-14. An attorney should resolve all doubts concerning whether the multiple representation might affect his judgment against undertaking the representation. CPR EC 5-15.

Even where an attorney is justified in accepting multiple representation of clients with differing interests,

> it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires.

CPR EC 5-16. Denver provided that opportunity to his promoter clients, but denied it to his investor clients. In so doing Denver violated his duty to explain any circumstances that might cause a client to doubt Denver's loyalty. CPR EC 5-19. Therefore, as a matter of law, Denver violated the CPR.

In this case, there are no material facts in dispute. Denver recognized from the beginning that a potential conflict of interest existed.[5] The source of that potential conflict is obvious. When Denver undertook the joint representation, he knew the IRS was disallowing these types of tax shelters. He knew the IRS would audit every investor, and he believed the IRS would disallow the tax credits and deductions. Most importantly, he knew that if the IRS disallowed the tax credits, his investor clients would potentially

---

[5]The following colloquy from Denver's deposition highlights this point.

"Q: When did [the potential for a conflict of interest] first become apparent to you?

"A: The potential for a conflict [of interest] between Mr. Johnston and his clients —

"Q: Goodwin and Johnston?

"A: Goodwin and Johnston, the sellers of these masters, existed on or about the 15th of October [1981]."

Respondents' Clerk's Papers, at 46-47. October 15, 1981, was the date Denver undertook the multiple representation.

have claims against his promoter clients, and the potential for a conflict of interest would be enhanced. Respondents' Clerk's Papers, at 87, 91.

Although it is clear that a potential conflict of interest existed prior to Denver undertaking the joint representation, and that Denver was aware of that conflict, that fact alone does not mandate a finding that Denver violated the CPR. An attorney may represent multiple clients with potentially conflicting interests where (1) it is obvious the attorney can adequately represent each client; and (2) each client consents to the multiple representation after full disclosure of the potential conflict. CPR DR 5-105(C). Denver did discuss the potential conflict of interest with his promoter clients (including his father-in-law) prior to undertaking the representation. Respondents' Clerk's Papers, at 86-87; Appellants'. Clerk's Papers, at 366. He did *not*, however, discuss the conflict with his investor clients. Thus, with respect to his investor clients, Denver violated the terms of CPR DR 5-105(C).

Denver does not contest the fact that he represented both investors and promoters, and he does not assert that he advised investors of potential conflicts of interest. There simply are no material facts in dispute. The trial court properly granted the investors' motion for partial summary judgment since it correctly concluded that, as a matter of law, Denver violated the CPR.

Our decision requires an attorney who is aware of potential conflicts to fulfill his or her duty under the CPR by fully disclosing those conflicts before undertaking the multiple representation. The attorney must also discuss the dangers inherent in multiple representation and allow the clients the opportunity to decide whether their interests are best served by independent representation. Today, we reaffirm this court's commitment to interpreting attorney discipline rules for the benefit of the public. An attorney must discuss all potential conflicts of interest of which he or she is aware prior to undertaking the multiple representation.

## II

The trial court ordered Denver to return all of the fees, plus prejudgment interest, paid by his investor clients. Denver maintains that the court's order is in error absent a finding of damages and causation. The only Washington case Denver cites for the proposition that the court must find damage and causation before ordering return of fees is *Sherry v. Diercks*, 29 Wn. App. 433, 628 P.2d 1336, *review denied*, 96 Wn.2d 1003 (1981). However, *Diercks* only holds that causation and damage must be shown to establish a *legal malpractice* claim against an attorney. 29 Wn. App. at 437-38.

The trial court did not decide that Denver committed malpractice. The trial court ruled as a matter of law that, because of the conflict of interest, Denver could not adequately represent both investors and promoters. The malpractice and negligence issues were reserved for phase two of the trial. Thus, Denver's reliance on malpractice cases is misplaced.

■ The trial court specifically relied on *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 85 L. Ed. 820, 61 S. Ct. 493 (1941) and *Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917 (2d Cir. 1950), *cert. denied*, 340 U.S. 831, 95 L. Ed. 610, 71 S. Ct. 37 (1950) in ordering disgorgement. In *Woods* a unanimous Court noted:

> Where [an attorney] . . . was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted. . . .
> . . . A fiduciary who represents [multiple parties] . . . may not perfect his claim to compensation by insisting that, although he had conflicting interests, he served his several masters equally well . . .. Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries "at a level higher than that trodden by the crowd." See Mr. Justice Cardozo in *Meinhard v. Salmon*, 249 N. Y. 458, 464; 164 N. E. 545 [(1928)].

*Woods*, 312 U.S. at 268-69. The general principle that a breach of ethical duties may result in denial or disgorgement of fees is well recognized. S. Gillers & N. Dorsen,

*Regulation of Lawyers: Problems of Law and Ethics* 265 (2d ed. 1989); *Ross v. Scannell*, 97 Wn.2d 598, 610, 647 P.2d 1004 (1982) ("[p]rofessional misconduct may be grounds for denying an attorney his fees").[6]

The trial court found that Denver violated the CPR and breached his fiduciary duty to his clients. Disgorgement of fees is a reasonable way to "discipline specific breaches of professional responsibility, and to deter future misconduct of a similar type." *In re Eastern Sugar Antitrust Litig.*, 697 F.2d 524, 533 (3d Cir. 1982). Such an order is within the inherent power of the trial court to fashion judgments. *Allen v. American Land Research*, 95 Wn.2d 841, 852, 631 P.2d 930 (1981). Therefore, the trial court's order is affirmed.

## III

The investors filed a cross appeal challenging the trial court's ruling concerning the application of the Consumer Protection Act.[7] In the trial court the investors brought a motion for summary judgment seeking a declaration that Denver's acts violated the CPA as a matter of law. The court denied the motion for summary judgment.

We must first determine whether the CPA applies at all on the facts of the case. To establish a CPA violation the claimant must prove the defendant's act or practice (1) is unfair or deceptive, (2) occurs in the conduct of trade or commerce, (3) affects the public interest, and (4) causes (5) injury to the plaintiff in his or her business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986). Thus, the CPA only applies to acts occurring in trade or commerce.

The provision of legal services does not generally fall within the definition of "trade or commerce", except as those services relate to the "entrepreneurial aspects" of the prac-

---

[6]*See also In re Eastern Sugar Antitrust Litig.*, 697 F.2d 524 (3d Cir. 1982); *Frank v. Bloom*, 634 F.2d 1245 (10th Cir. 1980); *United States v. Apple*, 292 F. 935 (8th Cir. 1923); *Moses v. McGarvey*, 614 P.2d 1363 (Alaska 1980); *In re Hansen*, 586 P.2d 413 (Utah 1978).

[7]RCW 19.86.

tice of law. *Short v. Demopolis*, 103 Wn.2d 52, 60-61, 691 P.2d 163 (1984); *Demopolis v. Peoples Nat'l Bank*, 59 Wn. App. 105, 796 P.2d 426 (1990). The entrepreneurial aspects of legal practice are those related to:

> how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients.

*Short*, 103 Wn.2d at 61. Claims for malpractice and negligence are not subject to the CPA, since those claims go to the competence and strategy of lawyers, and not to the entrepreneurial aspects of practice. *Short*, 103 Wn.2d at 61-62. This is true even where other remedies available are inadequate. *Short*, 103 Wn.2d at 62.

The trial court found, as a matter of law, that Denver violated the Code of Professional Responsibility and therefore breached his fiduciary duty to his investor clients. The investors claim that Denver's concurrent representation of clients with conflicting interests was an unfair or deceptive practice. They reason that, but for Denver's deceptive concealment of the conflict, the investor clients would not have engaged Denver. Therefore his deceptive act relates to the way he obtained his clients, and is part of the entrepreneurial aspect of practice.

The investors cite *Quimby v. Fine*, 45 Wn. App. 175, 724 P.2d 403 (1986), *review denied*, 107 Wn.2d 1032 (1987) to support their position. In *Quimby* plaintiffs alleged that a doctor substituted one medical procedure for another without the patient's informed consent. Quimby sued the doctor alleging, among other things, a violation of the CPA. The trial court denied defendant's motion for summary judgment on the CPA claim. In affirming the denial of the summary judgment motion, the Court of Appeals held the doctor's acts would be covered by the CPA if those acts involved the entrepreneurial aspects of practice. 45 Wn. App. at 181. The court held that if the plaintiff proved the doctor acted for the purpose of increasing profits or gaining clients, then his acts were entrepreneurial in nature. 45 Wn. App. at 181-82.

■ ■ Applying *Quimby's* reasoning to this case, Denver's acts only violated the CPA if he failed to disclose the conflict for the purpose of obtaining clients or increasing profits. Determining whether he acted for entrepreneurial purposes is a question of fact. *Quimby*, 45 Wn. App. at 182. It is a material fact because the outcome of the litigation depends on its resolution. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980). The fact is certainly disputed by the parties. Therefore, there is a material fact in dispute, and the trial court's denial of summary judgment was proper.

The investors also maintain the trial court erred in refusing to treble the amount disgorged, and to award attorney's fees under the CPA. Since the trial court found no CPA violation, there was no error. Even if there were a CPA violation, the amount of attorney's fees and costs awarded the prevailing party is within the discretion of the trial court. *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 314, 553 P.2d 423 (1976), *appeal dismissed*, 430 U.S. 952 (1977). The trial court's determination will not be overturned on appeal absent a manifest abuse of discretion. 87 Wn.2d at 314. No such abuse of discretion is present in this case.

## IV

This case was originally certified in 1986 as a CR 23(b)(3) class. In 1989, several months after the trial court granted the investors' motion for partial summary judgment, the investors moved to recertify the class to a CR 23(b)(2) class. The trial court denied the motion, ruling that:

> I simply feel [this motion] comes too late. . . .
>     Because of the fact that the Court has granted affirmative relief with respect to the disgorgement of fees, and because of the language of the rule, I do not think it is equitable that I grant the motion to amend the class order . . ..

Report of Proceedings (Feb. 1, 1989), at 27.

The investors argue the court should have recertified the class after the court bifurcated the trial. The court bifurcated the trial with one phase determining those issues

common to all members (phase one) and one phase determining individual issues of damages and malpractice (phase two). At that point, the investors argue, the court should have recertified phase one under CR 23(b)(2). CR 23(b)(2) applies where:

> The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . .[.]

The investors argue Denver's violation of the CPR affected the class as a whole. They further argue the trial court's order for a return of fees is akin to restitution, and therefore is injunctive in nature. The investors conclude that the disgorgement claim is common to all members of the class, and therefore the class should be recertified.

Denver contends, however, the trial court erred in denying his motion to decertify the class. He argues individual questions predominate over common ones, and that other forums were more appropriate for settling these claims.

A trial court's decision to certify a class is discretionary. *Washington Educ. Ass'n v. Shelton Sch. Dist. 309*, 93 Wn.2d 783, 790, 613 P.2d 769 (1980). The court's decision will not be overturned absent a manifest abuse of discretion. *Mullen v. North Pac. Bank*, 25 Wn. App. 864, 879, 610 P.2d 949, *review denied*, 94 Wn.2d 1009 (1980).

There is no manifest abuse of discretion in this case. CR 23(b)(2) is limited to injunctive or declaratory relief. 3A L. Orland, Wash. Prac., *Rules Practice* § 5263, at 427 (3d ed. 1980). The investors did not request, and the trial court did not grant, injunctive relief. The court did grant declaratory relief, in the sense that it declared Denver's actions violated the CPR. However, the court's order of disgorgement is monetary relief. Where the declaration merely forms the basis for monetary relief, a CR 23(b)(2) action is not appropriate. *See McDonnell Douglas Corp. v. United States Dist. Court*, 523 F.2d 1083 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 47 L. Ed. 2d 761, 96 S. Ct. 1506 (1976); 7A C. Wright, A. Miller & M. Kane, *Federal Practice* § 1775 (1986).

Even if the investors are correct that the class could have been certified under CR 23(b)(2), the question for this court is whether it was an abuse of discretion for the court to not recertify the class. It was the investors who initially requested the CR 23(b)(3) certification. They did not request recertification until after a determination of the case on the merits.[8] There was no abuse of discretion.

As to Denver's assignment of error, a trial court's class certification will be upheld if it appears from the record that the court considered all of the criteria of CR 23. *Washington Educ. Ass'n*, 93 Wn.2d at 793. Here the trial judge specifically concluded there were common questions of fact and that "the interests of justice would be impaired by requiring MRTF members to proceed individually." The judge also incorporated by reference the authorities and arguments cited in the investors' brief. Therefore, it is obvious the judge considered all of the criteria of CR 23. The trial court committed no error in denying Denver's motion to decertify the class.

DORE, C.J., and BRACHTENBACH, DURHAM, SMITH, and GUY, JJ., concur.

JOHNSON, J. (dissenting in part, concurring in part) — The majority affirms the trial court's summary judgment ruling that William James Denver violated DR 5-105 of the former Code of Professional Responsibility (CPR). In so holding, the majority concludes that CPR DR 5-105 may be violated whenever a "potential" conflict of interest exists, even though the rule is written in terms of "likely" conflicts of interest. The majority's unfortunate extension of CPR DR 5-105's clear language greatly burdens the attorneys of this state, for "potential" conflicts of interest exist in almost every case of multiple representation. I also disagree with

---

[8]Investors now seek recertification so that Denver will have to return the fees to those people who opted out of the CR 23(b)(3) litigation. Reply Brief of Respondents, at 8-9.

the majority's conclusion that this issue involves solely questions of law and with certain of the majority's statements of fact. I conclude genuine issues of material fact exist and that summary judgment was improperly granted. For these reasons, I dissent on the CPR DR 5-105 claim. As to the issues under the Consumer Protection Act and the certification of the class action, I concur in part and dissent in part.

I

Disciplinary Rule 5-105 of the former Code of Professional Responsibility reads in relevant part as follows:

> (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client *will be or is likely to be* adversely affected by the acceptance of the proffered employment, except to the extent permitted under section (C).
> (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client *will be or is likely to be* adversely affected by his representation of another client, except to the extent permitted under section (C).
> (C) In the situations covered by sections (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(Italics mine.)

This rule makes clear that the mere possibility of an adverse effect on the attorney's judgment does not constitute a disciplinary violation. A violation can occur only if the attorney's judgment is at least *likely* to be affected. Yet the majority holds that a "potential" conflict of interest can amount to a violation of CPR DR 5-105. Majority, at 460-61.

Nothing in the majority's analysis justifies this departure from the rule's express language. The majority maintains that its result is justified under a broad construction of the attorney disciplinary rules. Majority, at 458-59. Unambiguous language, however, must be construed according to its

terms; use of a liberal or broad construction is appropriate only with regard to ambiguous language. *See Clam Shacks of Am., Inc. v. Skagit Cy.*, 45 Wn. App. 346, 349, 725 P.2d 459 (1986), *aff'd*, 109 Wn.2d 91, 743 P.2d 265 (1987); 2A N. Singer, *Statutory Construction* § 58.05 n.4 (4th ed. 1984).

The majority's reliance on the Ethical Considerations underlying DR 5-105 is likewise improper here. The former CPR's Ethical Considerations were aspirational objectives toward which an attorney should strive, while the Disciplinary Rules represented "the minimum level of conduct below which no lawyer [could] fall without being subject to disciplinary action". See CPR Preliminary Statement. Although at times the Ethical Considerations may be used in interpreting language of the Disciplinary Rules, they should not be so used when they depart from a clear standard of conduct expressly and repeatedly stated in the Disciplinary Rules.

The majority's adoption of a standard involving "potential" conflicts of interest has severe consequences. Under the majority's interpretation, an attorney could be required to return fees even in cases where the chances of a conflict of interest are remote and unforeseeable. The consequences are especially severe when an attorney undertakes to jointly represent two or more clients. A potential conflict of interest would exist *whenever* an attorney jointly represented multiple clients, whether they be husbands and wives, general and limited partners, or corporate officers and shareholders. An attorney cannot foresee every possible situation that might arise when undertaking such a joint representation. Yet the majority's standard places exactly this burden on the attorney.

I also cannot concur in the majority's conclusion that determining whether CPR DR 5-105 has been violated involves only questions of law. See majority, at 457-58. Attorney disciplinary rules are to be interpreted according to the general principles of statutory interpretation. *See In re McGlothlen*, 99 Wn.2d 515, 522, 663 P.2d 1330 (1983). Whether a statute is violated involves mixed questions of

law and fact; the applicability of a statute to a given factual situation entails questions of law, while proof of the underlying facts necessarily involves questions of fact. *See Lobdell v. Sugar 'N Spice, Inc.*, 33 Wn. App. 881, 887, 658 P.2d 1267, *review denied*, 99 Wn.2d 1016 (1983). Thus, evaluating whether Denver violated CPR DR 5-105 involves not only questions of law, but also questions of fact.[9]

This much was recognized in *Halvorsen v. Halvorsen*, 3 Wn. App. 827, 830-31, 479 P.2d 161 (1970), *review denied*, 78 Wn.2d 996 (1971), where the Court of Appeals held that whether an attorney has a conflict of interest "is a fact question to be determined by looking to the reasonableness of the activity, under the whole circumstances of the case." *See also Johnson v. Continental Cas. Co.*, 57 Wn. App. 359, 362-63, 788 P.2d 598 (1990) (discussing the appropriateness of summary judgment in terms of disputes as to material issues of fact).

Moreover, issues of fact are particularly involved given the rule here at issue. CPR DR 5-105's language shows that the foreseeability of future events is key to determining whether the rule is violated. When deciding whether to represent potential clients, an attorney must predict what issues are likely to arise and predict further what positions the attorney will likely have to take on those issues. Foreseeability issues, like these, involve questions of fact. *See Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982); *Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wn.

---

[9]Cases cited by the majority involving the attorney disciplinary rules and conflicts of interest do not conflict with my conclusion. In *Stroud v. Beck*, 49 Wn. App. 279, 287-89, 742 P.2d 735 (1987), the Court of Appeals resolved summary judgment issues under the attorney disciplinary rules as a matter of law. This holding, however, does not reveal whether the issues involved questions of law or fact. Questions of law by definition may be resolved as a matter of law, but also under certain circumstances so may questions of fact. *See, e.g., Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 353, 779 P.2d 697 (1989). In *Marquardt v. Fein*, 25 Wn. App. 651, 654-56, 612 P.2d 378 (1980), the Court of Appeals affirmed a trial court's conclusion of law that an attorney had a conflict of interest. This conclusion of law, however, was based on findings of fact as to the circumstances establishing the conflict of interest. Thus, the issue was not purely one of law.

App. 432, 443, 739 P.2d 1177, *review denied*, 109 Wn.2d 1006 (1987); *Lake Wash. Sch. Dist. 414 v. Schuck's Auto Supply, Inc.*, 26 Wn. App. 618, 622-23, 613 P.2d 561, *review denied*, 94 Wn.2d 1024 (1980).

The majority concludes that the evidence shows "potential" conflicts of interest existed from the outset of Denver's representation of the promoters and investors. Majority, at 460. Because I believe the proper standard is whether "likely" conflicts of interest existed, I will review the majority's analysis of the evidence to show that it does not establish a likely conflict of interest.

The majority bases its conclusion first on the fact that "Denver recognized from the beginning that a potential conflict of interest existed." Majority, at 460. Denver did state in his deposition that he knew buyers could assert claims against sellers if problems with their sale later developed. This statement establishes merely the possibility of future conflicts of interest, not their likelihood.

Moreover, Denver's deposition testimony makes clear that although he initially recognized the existence of a potential conflict of interest, he considered this possibility "nebulous" and "remote". Respondents' Clerk's Papers, at 46-47, 86-87, 91, 96. He filed an affidavit explaining this point further:

> Although there is always a potential that a conflict may develop between the clients in a joint representation, I felt that a future conflict with respect to my MRTF representation was unlikely because I saw little or no possibility that the promoters and investors would have any interest in taking adverse positions *with respect to the IRS challenges*.

(Italics mine.) Appellants' Clerk's Papers, at 393.

The majority also bases its conclusion on the following depiction of Denver's state of mind:

> The source of that potential conflict is obvious. When Denver undertook the joint representation, he knew the IRS was disallowing these types of tax shelters. He knew the IRS would audit every investor, and he believed the IRS would disallow the tax credits and deductions. Most importantly, he knew that if the IRS disallowed the tax credits, his investor clients

would potentially have claims against his promoter clients, and the potential for a conflict of interest would be enhanced.

Majority, at 460-61.

These statements are not fully supported by the record. First, while the majority implies that Denver knew the IRS was denying the tax benefits in all similar cases, the record reveals merely that he knew the IRS was "almost" automatically denying these benefits. Respondents' Clerk's Papers, at 52. Second, Denver did not indicate the IRS would audit *every* investor, rather Denver merely agreed with a statement in an exhibit to the effect that "[e]ven if you are not now under audit, you should assume that you *may* come under audit sooner or later." (Italics mine.) Respondents' Clerk's Papers, at 78. When Denver undertook the representation, only a small portion of the investors were then being audited, although he believed it was likely that "more" would be audited in the future. Respondents' Clerk's Papers, at 68. Although my reading of the record on these points does not differ markedly from that of the majority's, these differences do come into play in determining if factual issues exist.

Of greater significance is the majority's statement that Denver believed the tax benefits in this case were sure to be denied. This statement finds no support in the record. Denver never admitted to any such belief, and in fact he agreed to represent the MRTF only after reviewing tax laws and after determining that the transactions did not suffer from the documentation deficiencies that had prevented previous programs from receiving the desired tax benefits:

> The legal issues were relatively simple. The IRS was arguing that the taxpayers were not involved in a trade or business for production of income or, in the alternative, that the transactions lacked sufficient economic substance to justify claimed credits and deductions. My review of many other similar programs revealed them lacking in certified costs, adequate appraisals, and actual product distribution. In the case of the programs purchased by Mr. Johnston, however, appraisals did exist, prepared by nationally recognized appraisers; also, the law firm of Kafer, Good, St. Mary & Mitchell had prepared an opinion of letter purporting to reflect

certified acquisition and production costs of each of the Masters. Additionally, it appeared that Gerald B. Dennon, then president of Jerden Industries [for whom the promoters in this case acted as sellers], had numerous years of entertainment industry background. Based upon that investigation and my investigation of the tax laws in effect at that time, I agreed to represent Mr. Johnston and clients of his similarly situated [with respect to obtaining tax benefits].

Respondents' Supplemental Clerk's Papers, at 29.

Thus, factual issues remain unresolved even on the question of whether the tax benefits in this case were likely to be denied when Denver began representing the promoters and investors.

Yet further factual issues exist. Even if the record did establish that Denver believed the benefits would be denied, the investors would not have proven a likely conflict of interest. This is because the interests of the promoters and the investors were identical with respect to the granting or denying of tax benefits. The promoters as well as the investors had purchased the master sound recordings, and they all wanted to obtain an IRS determination that their investments were entitled to credits and deductions. Each of the MRTF members opted to participate in the fund's hiring of a single attorney to pursue this goal. In this regard, the promoters and the investors were all similarly situated when Denver agreed to represent them. Expert affidavits from two prominent attorneys establish that under these circumstances no conflict of interest arises. Appellants' Clerk's Papers, at 384-85, 388-89.

Nor have the plaintiffs established that any future events were likely to cause these interests to diverge. Widespread title and appraisal problems were not discovered until a year and a half after Denver undertook representation of these clients, and the investors do not even allege that Denver had any reason to know about these problems earlier.

The plaintiffs have also speculated that as the negotiations with the IRS proceeded without immediate resolution, the interests of the promoters and investors began to diverge as to the speed with which the negotiations were

pursued. They point out that the promoters continued to sell the recordings, and therefore had a motivation for delaying an IRS decision, while the investors' potential tax obligations were accruing interest, causing the investors to want a prompt decision. Even aside from the speculative nature of this argument,[10] it wholly fails to establish that at the outset of Denver's representation, the IRS proceedings were likely to drag on so long that the promoters and investors would have developed different interests in this regard.

I believe in light of the foregoing discussion that genuine issues of material fact remain on the plaintiffs' CPR DR 5-105 claim. Even though very few of the facts presented by the plaintiffs have been contradicted by Denver, the inferences flowing from those facts are certainly open to different interpretations. Specifically, reasonable minds could differ as to the foreseeability, as measured at the outset of Denver's representation, that events causing a divergence of interests between the investors and promoters were likely to occur. Summary judgment is improper, even if the basic facts are not in dispute, if those facts are reasonably subject to conflicting inferences. *See Coffel v. Clallam Cy.*, 58 Wn. App. 517, 520, 794 P.2d 513 (1990); *Southside Tabernacle v. Pentecostal Church of God, Pac. Northwest Dist., Inc.*, 32 Wn. App. 814, 821, 650 P.2d 231 (1982).

## II

The parties have also appealed from various trial court rulings addressing both the Consumer Protection Act (CPA) and certification of the class action. I concur in the majority's resolution of these issues, except for a portion of its analysis of the CPA.

The majority holds that a genuine issue of material fact exists regarding application of the CPA. Majority, at

---

[10]The promoters, along with the investors, had purchased recordings and therefore had the same incentive as the investors in minimizing the accrual of interest. The record provides no basis for determining whether this accruing interest would offset the gains that promoters would garner from additional sales. Moreover, the investors' statement that they wanted the matter speedily resolved is not supported by any record evidence that an investor at any point indicated dissatisfaction with the speed of the ongoing negotiations.

463-65. I agree. The majority proceeds to hold that the trial judge properly exercised his discretion in refusing to treble the amount of the disgorged fees and in refusing to award attorney fees. Majority, at 465. I agree in part and disagree in part.

RCW 19.86.090 expressly provides that a trial court's decision whether to treble damages is discretionary. I agree with the majority that discretion was not abused on this point.

I disagree with the majority, however, with respect to the attorney fee issue. Under RCW 19.86.090, a prevailing CPA plaintiff is entitled to reasonable attorney fees incurred in pursuing the CPA action. The trial court has discretion in setting the *amount* of the attorney fees, *see State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 314, 553 P.2d 423 (1976), *appeal dismissed*, 430 U.S. 952 (1977), but not in deciding whether attorney fees should be awarded in the first place. *See State v. Black*, 100 Wn.2d 793, 805, 676 P.2d 963 (1984) (concluding that the award of attorney fees in a private action under RCW 19.86.090 is *mandatory*, while the award of fees in an Attorney General action under RCW 19.86.080 is discretionary).

The majority errs in allowing the trial court to deny attorney fees as a matter of discretion. I would reverse the trial court's denial of attorney fees. The plaintiffs should be granted attorney fees if they prevail on their CPA claim at trial on remand.

In sum, I would reverse the trial court's summary judgment ruling that CPR DR 5-105 had been violated; I would reverse in part and affirm in part the trial court's summary judgment rulings concerning the CPA; and I would affirm the trial court's rulings regarding the class certification issues. I would remand the case for further proceedings.

DOLLIVER and ANDERSEN, JJ., concur with JOHNSON, J.