[No. 200,479-2.   En Banc.]
Argued January 15, 2008.     Decided July 17, 2008.

*In the Matter of the Disciplinary Proceeding Against* MARK STANSFIELD, *an Attorney at Law.*

*Mark Stansfield*, pro se.
*Leland G. Ripley*, for the attorney.
*Natalea Skvir*, for the Bar Association.

¶1 CHAMBERS, J. — Mark Stansfield was admitted to the Washington State Bar in 1980 and was actively practicing law in 2003 when the cases underlying this matter began. Prior to these proceedings, he had no discipline history. A hearing officer found that he violated former RPC 1.2(f) (2002) by purporting to represent a person without authority and former RPC 1.9 (1993) by representing clients with adverse interests. The hearing officer recommended sanctions of a reprimand and admonition respectively. The Washington State Bar Association Disciplinary Board upheld the violations but recommended a six month suspension as a sanction. We affirm the violations but conclude that the board erred in failing to adopt some of the hearing officer's findings of fact, particularly those findings relating to Stansfield's motives and state of mind. We impose two reprimands, order Stansfield to pay restitution to Olga Chavez for the delay of her receipt of funds, and order him to disgorge the fee he received from his representation of Francisco Vargas.

## FACTS

### Motor Vehicle Collision

¶2 On May 9, 2003, Francisco Vargas, Jr.,[1] sped through a stop sign in Quincy, Washington, and struck a car driven by Miguel Urquilla. After the collision, both vehicles came

---

[1] Francisco Vargas, Jr., will be referred to as "Vargas." Other family members will be referred to using first and last names.

to rest upside down. Both Miguel Urquilla and his passenger, Miguel Chavez, were killed.[2] Vargas was uninsured, and the police report stated that "there is probable cause to believe that the collision was due to Francisco L. Vargas operating his Lexus 'while under the influence of intoxicating liquor or any drug.'" Ex. 50, at 12.

Urquilla Representation

¶3 On May 20-21, 2003, Miguel Urquilla's widow, Rosa Urquilla,[3] and her daughter, Ivon Urquilla, met with Stansfield. Urquilla did not speak English, so her daughter acted as her interpreter. According to Stansfield, Urquilla told him that she needed help collecting underinsured motorist (UIM) benefits. Miguel Urquilla had UIM coverage with Farmers Insurance Company, and Farmers would tender policy limits only if the Urquilla estate was probated and there was a personal representative appointed. Urquilla also asked about suing Vargas for wrongful death, but Stansfield counseled her against pursuing the claim because Vargas lacked assets.

¶4 According to Stansfield, he was retained solely to probate the estate to facilitate collection of the Farmers insurance money. He took the case on an hourly basis instead of a contingency because the insurance company had already offered policy limits and because the limits were low. It is uncontested that Stansfield promptly filed the probate in Grant County Superior Court and Urquilla was appointed personal representative. Farmers transmitted the $50,000.00, and Urquilla, as personal representative, gave notice of an early distribution of the $50,000.00 and filed a notice of completion, all within 90 days. Stansfield distributed $48,142.95 to the estate and retained the difference for his fees and costs.

---

[2] One of Vargas's passengers also died in the collision.

[3] Rosa Urquilla will be referred to as "Urquilla." Other family members will be referred to using first and last names.

Chavez Representation

¶5 Around the same time Urquilla retained Stansfield, she told Stansfield that Miguel Chavez's widow lived in Guatemala and was ill because of her shock at her husband's death. According to Stansfield, Urquilla told him that Olga Chavez[4] had given her authority to act as personal representative of the Chavez estate. Stansfield had Urquilla sign a fee agreement and other documents as personal representative of the Chavez estate. Stansfield notified Farmers that he represented the estates of both Miguel Urquilla and Miguel Chavez. He then wrote a letter to Chavez, translated into Spanish, asking her whether she wanted him to handle her husband's estate and if she wanted to be the personal representative or Urquilla to be personal representative. Stansfield received no response to his letter to Chavez, so he followed up with another letter to which there was also no response. He also drafted pleadings for the probate of the Chavez estate, although he never filed them. He contends that his efforts on behalf of Chavez and the Chavez estate were motivated by a desire to protect them from others who might take advantage of them.

¶6 Meanwhile, on June 13, 2003, Chavez executed a power of attorney authorizing her brother-in-law, Mario Chavez, to find a lawyer to represent her family and her husband's estate. Mario Chavez hired attorney Glenn Carpenter, who filed a UIM claim, investigated possible wrongful death actions against both Vargas and Miguel Urquilla, and probated the Chavez estate.[5] On August 29, 2003, after he learned from the insurance adjuster that Stansfield claimed to be representing the Chavez family, Carpenter faxed a letter to Stansfield, asking him to stop his representation and informing Stansfield that Chavez had retained Carpenter to probate her husband's estate. On

---

[4] Olga Chavez will be referred to as "Chavez." Other family members will be referred to using first and last names.

[5] Carpenter testified that he was retained on a contingent fee basis.

September 3, 2003, Stansfield responded by filing an attorney's lien for $2,299.32 against the Chavez estate.

¶7 On January 12, 2004, the insurance company issued a $50,000 check made payable to Carpenter, Stansfield, and Susanne Ruiz, the personal representative of the Chavez estate. Carpenter contacted Stansfield, asking permission to endorse his name on the check and assuring him that funds double his lien would be kept in the personal representative's trust account until his claim was resolved. Stansfield declined to endorse the check, although he did offer to compromise on his bill. Carpenter did not respond to Stansfield's offer. Carpenter persuaded the insurance company to split the insurance proceeds into two checks: one for $45,000, which did not name Stansfield, and another for $5,000, which required Stansfield's endorsement. In March 2004, Carpenter and Ruiz endorsed the larger check and sent the funds to Chavez. On April 12, 2004, Ruiz denied Stansfield's claim against the Chavez estate. Stansfield took no further action to enforce his lien. On November 16, 2005, Stansfield learned that Carpenter was still holding the $5,000 check and sent a formal notice of vacation of his lien. During the first week of January 2006, Carpenter received the remaining $5,000 insurance benefit and disbursed the funds to Chavez.

## Vargas Representation

¶8 On September 2, 2003, Vargas was charged with three counts of vehicular homicide and two counts of vehicular assault arising from the motor vehicle collision. His arraignment was set for the morning of September 22, 2003. The Friday afternoon before his arraignment, Vargas and his mother, Maria Vargas, who had known Stansfield for 15 years, went to Stansfield's office without an appointment and asked Stansfield to represent Vargas. They brought with them the documents they received from the prosecuting attorney, including the charging information. The first and second pages of the information list Miguel Urquilla and Miguel Chavez as the victims. Stansfield

testified that although he suspected that the accident involved Miguel Urquilla, he does not remember what documents he received or reviewed. According to Maria Vargas, Stansfield told her that "he had helped the Urquilla family, but that he would probably talk to somebody and he thought it would probably be okay for him to represent [Vargas]." Hearing Transcript (HT) at 274.

¶9 On Monday, September 22, 2003, before the arraignment, Stansfield had the Vargases sign a fee agreement charging them a nonrefundable flat fee of $10,000, retaining him for all "services including negotiations for settlement, pre-trial motions, if necessary, and settlement by the way of deferred sentence, plea of guilty, or a stipulation resulting in a finding of guilty, or any other settlement prior to trial," and requiring an additional $1,500 per day if the case proceeded to trial. Ex. 40A. The Vargases paid Stansfield the full $10,000 prior to the arraignment. Stansfield represented Vargas at the arraignment, and Vargas pleaded not guilty. On the same day, Stansfield filed a notice of appearance, a notice of demand for discovery, a demand for preservation of evidence, a demand for jury trial, and a demand for a bill of particulars on behalf of Vargas.

¶10 The Urquillas attended Vargas's arraignment and were "shocked" and "extremely upset" to see Stansfield representing Vargas. HT at 201-02, 228. After the arraignment, the Urquillas met with Carolyn Fair, the deputy prosecutor for Grant County, and expressed their concerns. Fair called Stansfield's office and spoke with his assistant, asking if Stansfield was planning to voluntarily withdraw his representation or if she needed to bring a motion. She did not speak directly to Stansfield, and he testified that he never received a message from her.

¶11 After the arraignment, Stansfield reviewed the Vargas court file and the Urquilla probate file and, after discussing the issue with another attorney, decided to withdraw from the case because he felt "uncomfortable." On October 7, 2003, Stansfield filed a notice of substitution of

counsel and transferred all but $250 of the $10,000 flat fee to substitute counsel.

## PROCEDURAL HISTORY

¶12 In February 2005, the Washington State Bar Association (WSBA) formally charged Stansfield with violating former RPC 1.2(f) (Count 1) and former RPC 1.9 (Count 2).[6] The hearing officer found that Stansfield negligently violated both rules. He also found three aggravating factors: multiple offenses, vulnerability of the victim, and substantial experience in the practice of law; and one mitigating factor: absence of a prior disciplinary record. The hearing officer recommended reprimanding Stansfield for Count 1 and admonishing him for Count 2.

¶13 On appeal, the board made substantial changes to the hearing officer's findings of fact. The board also modified a number of the hearing officer's conclusions of law. In an 8-3 decision, it found that Stansfield knowingly violated both former RPC 1.2(f) and former RPC 1.9(a) and recommended suspending Stansfield's license for six months. Three dissenting board members found Stansfield acted negligently and recommended that he be reprimanded for both violations, that he pay restitution to Chavez for the delay of her receipt of funds, and that he disgorge the fee he received from his representation of Vargas.

## ANALYSIS

### MISCONDUCT

¶14 Lawyer discipline in Washington is ultimately the responsibility of this court. *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 329, 157 P.3d 859 (2007). Findings of fact are reviewed for substantial evidence. *In re Disciplinary Proceeding Against Carpenter*, 160

[6] Stansfield was originally also charged with violating former RPC 8.4(c) (2002) (Count 3), but this count was dismissed.

Wn.2d 16, 23, 155 P.3d 937 (2007). Conclusions of law are reviewed de novo. *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 59, 93 P.3d 166 (2004). We will generally sustain the board's findings if the findings are supported by substantial evidence. *In re Disciplinary Proceeding Against Trejo*, 163 Wn.2d 701, 718, 185 P.3d 1160 (2008).

¶15 Count 1 alleges that Stansfield willfully purported to represent the Chavez estate without authority in violation of former RPC 1.2(f).[7] Former RPC 1.2(f) provides that "[a] lawyer shall not willfully purport to act as a lawyer for any person without the authority of that person." Stansfield does not assign error to the board's conclusion that he violated former RPC 1.2(f). Rather he contests the board's finding that the violation was knowing rather than negligent. It may be that Stansfield was led to believe that Urquilla had authority to represent the Chavez estate for a short period of time; however, he never received authorization from anyone with legal authority to file a probate action. Stansfield corresponded with both the insurance company and the sheriff's office, informing them that he represented the Chavez estate. Although the violation might have been relatively harmless had he promptly corrected his mistake, he compounded the error by filing an attorney's lien for work performed for an estate that never retained or authorized him to perform services, thereby delaying payment to Chavez. The board's conclusion that Stansfield violated former RPC 1.2(f) is amply supported by the record.

¶16 Count 2 alleges that Stansfield violated former RPC 1.9 because he had a conflict of interest in representing both the Urquilla estate and Vargas, who was charged with three counts of vehicular homicide, including the homicide of Miguel Urquilla. Former RPC 1.9 provides that

---

[7] The language of former RPC 1.2(f) was moved from RLD 1.1(d) and added to the RPCs in 2002 with no substantive change. 2 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RPC 1.2, at 362 (6th ed. 2004). The RPCs were revised again effective September 1, 2006. The new RPCs do not include this provision.

[a] lawyer who has formerly represented a client in a matter shall not thereafter:

(a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents in writing after consultation and a full disclosure of the material facts.

¶17 Stansfield contends that the board erred because his representation of the Urquilla estate was not the same or a substantially related matter as the Vargas criminal case, nor were the interests of the two clients adverse.

¶18 Comment 3 to model rule 1.9 declares that "[m]atters are 'substantially related' . . . if they involve the same transaction or legal dispute *or* if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." MODEL RULES OF PROF'L CONDUCT 45 (2007) (emphasis added).[8]

¶19 Stansfield premises his argument on the theory that the Vargas criminal case is unrelated to his handling of the Urquilla probate. He stresses that his role was limited to establishing a probate to facilitate payment of Farmers policy limits and that he refused to represent Urquilla or the Urquilla estate in a negligence action against Vargas arising out of the motor vehicle collision. He reasons that, because the victim has no standing to intervene in a criminal prosecution, the victim's interest is not adverse to the criminal defendant. To support his argument, he cites

---

[8] While this court has not formally adopted the commentary to the *Model Rules*, we have noted that it " 'may be instructive in exploring the underlying policy of the rules.' " *In re Disciplinary Proceeding Against Haley*, 156 Wn.2d 324, 334, 126 P.3d 1262 (2006) (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 595, 48 P.3d 311 (2002)).

several cases from other jurisdictions, mostly involving criminal appeals arguing ineffective assistance of counsel.[9]

¶20 We are not persuaded by Stansfield's argument. Miguel Urquilla was the victim of the motor vehicle collision. Rosa Urquilla sought legal assistance because of the same collision. While it is true she saw Stansfield specifically to establish a probate and be appointed as personal representative of the estate, she also inquired about bringing a wrongful death action against Vargas for causing the collision. If convicted, Vargas may have been required to pay restitution to the Urquillas. We conclude that Urquilla was justified in being "shocked" at the arraignment hearing to see her lawyer representing the man charged with killing her husband. The record supports the board's conclusion that the Urquilla probate and insurance collection matter and the Vargas criminal matter were related, that the interests of his two clients were adverse, and that Stansfield violated former RPC 1.9.

SANCTIONS

¶21 We most recently surveyed disciplinary sanctions in *Trejo*, 163 Wn.2d at 718. We use the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (*ABA Standards*) as a basic guide. *In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 758, 108 P.3d 761 (2005). In order to address what the American Bar Association (ABA) perceived as a disparity among the states in the sanctions imposed for very similar conduct, the ABA developed a framework to

---

[9] *See, e.g., Crisp v. Duckworth*, 743 F.2d 580, 588 (7th Cir. 1984) (no conflict of interest where defense attorney had represented victim in "completely unrelated action" two years earlier); *Moseley v. Scully*, 908 F. Supp. 1120, 1138-39 (E.D.N.Y. 1995) (no conflict of interest where defense attorney had previously represented victim on "minor gambling offense unrelated to her murder"); *Dixson v. Quarles*, 627 F. Supp. 50, 54-55 (E.D. Mich. 1985) (no ineffective assistance where defense counsel had previously represented murder victim); *In re Interest of S.G.*, 348 N.J. Super. 77, 80, 791 A.2d 285 (2002) (affirming denial of motion to disqualify defense counsel who previously represented victim on unrelated charges), *rev'd on other grounds*, 175 N.J. 132, 814 A.2d 612 (2003).

make the sanctions more uniform. The ABA did not attempt to standardize or categorize misconduct and sanctions. Rather, the ABA recognized the vastly varying circumstances that might arise and proposed "guidelines which give courts the flexibility to select the appropriate sanction in each particular case of lawyer misconduct." ABA STANDARDS at 6. The flexible framework requires that the court examine several elements. The ABA model requires the court imposing sanctions to answer four questions: (1) What ethical duty did the lawyer violate? (2) What was the lawyer's mental state? (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (4) Are there any aggravating or mitigating circumstances? *Id.* at 5.

¶22 No one question or element determines the sanction, but all four must be evaluated. In evaluating the duty violated, the ABA model assumes that ethical duties to the client are most important, but there are also duties to the legal system and to the general public. *Id.* Members of the public are entitled to trust and have confidence in lawyers. *Id.*

¶23 Often the primary dispute, as in the case before us, is the mental state of the lawyer. The ABA has illustrated the mental state issue as follows. If a lawyer was given $100 as an advance against the costs of investigation, took the money, deposited it in a personal checking account, and used it for personal expenses, then the lawyer acted intentionally, the client actually suffered an injury, and the most severe presumptive sanction, disbarment, would be appropriate. *Id.* at 6. By contrast, if the lawyer who received the $100 advance for investigation costs was in a hurry to get to court, neglected to deposit or inform her staff what to do with the funds and they were erroneously deposited to the general account, and the lawyer upon discovery immediately replaced the money, then the lawyer was merely negligent, little or no damage occurred to the client, and the appropriate presumptive sanction would be either reprimand or admonition. *Id.*

¶24 The ABA has further explained and defined the mental state element:

> The *mental states* used in this model are defined as follows. The most culpable mental state is that of <u>intent</u>, when the lawyer acts with conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of <u>knowledge</u>, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is <u>negligence</u>, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.

*Id.* (underscore added).

¶25 The ABA definitions of the mental states apply both to the misconduct and to the consequences. Each definition of mental state relates the mental state to a "particular result" or "result." *Id.* The ABA standards further provide that disbarment is the appropriate sanction "when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client." ABA STANDARDS std. 4.61. It has been observed, "[I]n cases where we have found an attorney acted with an intentional state of mind, generally the attorney's intent was to benefit herself or himself." *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 239, 125 P.3d 954 (2006) (Madsen, J., dissenting); *see also In re Disciplinary Proceeding Against VanDerbeek*, 153 Wn.2d 64, 90 n.24, 101 P.3d 88 (2004). We do not require proof of state of mind relating to the consequences; it is sufficient if the facts support a conclusion that the lawyer either knew or should have known that adverse consequences would occur. *See In re Disciplinary Proceeding Against Egger*, 152 Wn.2d 393, 416, 98 P.3d 477 (2004) ("[T]his court has found knowledge where an attorney knew *or should have known* that a conflict existed.").

¶26 Generally, if the misconduct is done negligently, the presumptive sanction is reprimand; if done

knowingly, the presumptive sanction is suspension; and if done intentionally, the presumptive sanction is disbarment. ABA STANDARDS stds. 4.31, 4.32, 4.33; *Egger*, 152 Wn.2d at 415. We clarify that although the mental state generally establishes the presumptive sanction, it does not establish a per se presumptive sanction. Mental state is only one of four elements to be considered by the sanctioning body. All of the four elements are important.

¶27 The line between negligent acts and acts with knowledge can be fine and difficult to discern, yet the difference between the presumptive sanction of reprimand or suspension is great. Often, however, the mental state of the lawyer is the clear and determinative factor in establishing the appropriate presumptive sanction. For example, assume a lawyer with no discipline history was in trial and forgot to file a notice of appeal. The presumptive sanction for such a mistake would likely be an admonition or a reprimand, depending upon the harm to the client and efforts by the lawyer to remediate the harm. Assume now that a lawyer with no discipline history, who had upon numerous requests of his client promised to file a notice of appeal on several occasions during the preceding weeks, was in trial and forgot to file the notice of appeal. The lawyer who has assured her client on several occasions that she will file the notice but fails to do so seems close to satisfying the definition of acts or failure to act "with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result," the definition of "knowledge." ABA STANDARDS at 6. The presumptive sanction for this lawyer may well be suspension, depending on the harm to the client and efforts to remediate. Having thus surveyed the state of our law on attorney disciplinary sanctions, we turn to the case at hand.

¶28 As we discussed above, the board changed and modified numerous findings of fact and conclusions of law made by the hearing officer and changed the sanction from a reprimand and admonition to a six month suspension.

Stansfield assigns error to the board's modifying the findings, the conclusions, and the sanction. "The Board reviews findings of fact for substantial evidence. The Board reviews conclusions of law and recommendation de novo." ELC 11.12(b). We review the board's findings of fact for substantial evidence and review its conclusions of law de novo. *Guarnero*, 152 Wn.2d at 58-59.

¶29 However, on issues of findings of fact, we give deference to the hearing officer. "We give considerable weight to the hearing officer's findings of fact, especially with regard to the credibility of witnesses, and we will uphold those findings so long as they are supported by 'substantial evidence.'" *Poole*, 156 Wn.2d at 208. We give great weight to a hearing officer's determination of an attorney's state of mind because it is a factual finding. *Trejo*, 163 Wn.2d at 721; *In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 744, 122 P.3d 710 (2005).

¶30 On the other hand, on the issue of sanctions, it is the board's recommendation that receives greater deference. "Generally, we give greater weight to the Board's sanction recommendation than we give to the hearing officer's, and although we are not bound by the Board's recommendation, we recognize that as 'the only body to hear the full range of disciplinary matters,' the Board has the 'unique experience and perspective in the administration of sanctions.'" *Egger*, 152 Wn.2d at 404 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Cohen*, 150 Wn.2d 744, 754, 82 P.3d 224 (2004)); *see also Marshall*, 160 Wn.2d at 343.

¶31 The board changed several of the hearing officer's findings of fact that relate to Stansfield's state of mind. Stansfield argues that the hearing officer was in the best position to determine the credibility of the witnesses and in particular to determine Stansfield's own credibility and state of mind. We agree that the board should have given greater deference to the hearing officer's factual findings. For example, the board struck the hearing officer's finding 3.1: "After listening to the case for approximately two days,

arguments of counsel and review of the notes and exhibits, I find that Respondent had nothing but the best intentions in mind when representing any of the parties involved with the Association's Complaint." Decision Papers (DP) at 21. The board struck this finding because "Respondent's subjective state of mind is not relevant." DP at 40 n.8. The board also struck without explanation the hearing officer's finding 2.13: "Respondent represented the Urquillas in a very professional manner and was more than fair with the Urquillas regarding settling claims with the insurance company and settling Mr. Urquilla's estate." DP at 16, 35. These findings are perhaps not material to the counts of misconduct against Stansfield, but they are relevant to his motivation and state of mind in his dealings with these clients.

¶32 With regard to undertaking the representation of Chavez, the hearing officer entered finding 2.12: "Respondent's only motives were to get a good resolution so the families could receive the funds from the insurance company." DP at 34. As another example, the hearing officer's finding 2.9 stated, "The respondent being compassionate by nature, took on the representation of both estates for the respective families." *Id.* Stansfield did testify that he was concerned that Urquilla was really trying to get control of the Chavez money and he was concerned about protecting the Chavez funds. The facts also support that Stansfield charged an hourly rate rather than a contingent fee because he felt it was improper to take a contingent fee percentage of the recovery because the insurance company had already offered policy limits. The board rejected both of the findings as not established by the record. We disagree; these findings appear to be based upon the hearing officer's observations and conclusions about Stansfield's credibility and state of mind.

¶33 With respect to Stansfield's representation of the Chavez estate, we accept the hearing officer's findings regarding Stansfield's motivations. Although it was a violation of former RPC 1.2(f) to purport to represent Chavez

without authorization, it appears that Stansfield acted diligently, at a reasonable cost to his clients, and with good motives. Although Stansfield compounded his mistake (and satisfied the injury requirement under our sanctions analysis) when he filed an attorney's lien against the Chavez estate for unauthorized legal fees and caused a delay in Chavez receiving some of the settlement, we must determine his state of mind in purporting to represent Chavez, not in filing the attorney's lien. Stansfield acknowledged that Carpenter was the attorney for the Chavez estate at the same time he asserted a right to fees, and the WSBA has not alleged it was misconduct to file the lien. As described above, sometimes there is a fine line between negligence and knowledge. If Stansfield acted with a "conscious awareness of the nature or attendant circumstances of [the] conduct but without the conscious objective or purpose to accomplish a particular result," he acted with knowledge. ABA STANDARDS at 6. But, if Stansfield "fail[ed] to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation," then he acted negligently. *Id.*

¶34 Whether he acted with a conscious awareness or merely failed to heed a substantial risk that there would be consequences in purporting to represent Chavez or the Chavez estate is a difficult question. The board found that he acted knowingly, but the hearing officer and three members of the board concluded that he acted negligently. The WSBA argues Stansfield acted knowingly because he either knew or should have known there would be consequences to his violation of former RPC 1.2(f). However, if we adopted the WSBA's reasoning, no misconduct would be negligent because rather than failing to heed a substantial risk, we would always assume the lawyer should have known the substantial risk. We decline to adopt the WSBA's argument. Giving deference to the hearing officer's findings with regard to Stansfield's intentions and motives, together with his prompt, efficient, and fair representation of the

Urquilla estate, we conclude that Stansfield's mental state when violating former RPC 1.2(f) falls closer to failing to heed a substantial risk than a conscious awareness and conclude from all of the circumstances that his mental state was negligence.

¶35 Our sanction for Count 1, in purporting to represent Chavez, depends on not just the mental state, but on the duty and harm as well. The ethical duty Stansfield breached was to his client. We have concluded his state of mind was negligence. There was actual damage to the client because of the delay in receiving a portion of the settlement because of the attorney's lien he filed. And there was potential damage to the legal system by Stansfield's misconduct. The presumptive sanction for Count 1 is reprimand.

¶36 Stansfield also violated former RPC 1.9, Count 2, by representing both the Urquilla estate and Vargas, whose interests in the same or substantially related matters were materially adverse. Stansfield's state of mind is again difficult to assess. The hearing officer found that it was negligence, and three members of the board agreed. A majority of the board, however, concluded Stansfield acted with knowledge. Stansfield certainly knew or should have known that he was representing two clients for matters arising out of the same tragic auto accident. The difficult issue is whether, as he undertook to represent Vargas, he had a "conscious awareness" that there could be some consequences to his clients for his actions or whether he merely failed to heed a substantial risk. *See* ABA STANDARDS at 6.

¶37 He contends that his role in the Urquilla estate was very limited and that in his mind the Vargas criminal defense was unrelated to the Urquilla probate. While we have held that he was wrong and the two matters were related, if he is to be believed, his conduct is closer to a lawyer who "fails to be aware of a substantial risk that circumstances exist or that a result will follow," which is the definition of "negligence." *Id.* His position is bolstered by

the finding of the hearing officer: "After listening for approximately two days, arguments of counsel and review of the notes and exhibits, I find that Respondent had nothing but the best intentions in mind when representing any of the parties involved with the Association's Complaint." DP at 21. We conclude that Stansfield's state of mind for Count 2 is negligence.

¶38 We now consider all three factors in Count 2 to determine the presumptive sanction. The breach of the ethical duty was to the clients, and his state of mind was negligence. Each client was injured because Urquilla was "shocked" to see Stansfield representing Vargas at Vargas's arraignment and Vargas was forced to obtain new counsel. Stansfield's representation of both the Urquillas and Vargas was also potentially harmful to the reputation of the legal profession. But neither client was harmed greatly, and Stansfield took prompt action to correct his mistake once it came to his attention. The appropriate presumptive sanction for Count 2 is reprimand.

AGGRAVATING AND MITIGATING FACTORS

¶39 Having examined the elements of (1) duty, (2) mental state, and (3) harm, we hold that the presumptive sanction for each count of misconduct is reprimand, and we now turn to aggravating and mitigating factors. The board found three aggravating factors: multiple offenses, substantial experience in the practice of law, and vulnerability of the victim. We conclude that the record supports the first two aggravators but not the third. This court has found that " 'clients unfamiliar with the legal system, and clients who have cultural and language barriers, are not vulnerable victims absent a showing of physical or mental disability or other characteristic that renders them "particularly vulnerable." ' " *In re Disciplinary Proceeding Against Blanchard*, 158 Wn.2d 317, 332, 144 P.3d 286 (2006) (quoting *In re Disciplinary Proceeding Against Christopher*, 153 Wn.2d 669, 682, 105 P.3d 976 (2005)). Although

Chavez was poor and living in Guatemala, had seven children, had little schooling, was illiterate in Spanish, and was unable to speak English, the record does not establish that Stansfield was aware of many of these characteristics or that Stansfield took advantage of Chavez. Substantial evidence does not support a finding that Chavez was a vulnerable victim.

¶40 The board also found one mitigating factor: absence of a disciplinary record. Stansfield asks us to find two other mitigating factors: full and free disclosure to the disciplinary board or cooperative attitude toward these proceedings and character and reputation. Stansfield did not present these arguments at the initial hearing or before the board, and we decline to consider them now. RAP 2.5(a). Balancing the remaining aggravating and mitigating factors, we conclude that two reprimands is the appropriate sanction. Stansfield is further required to pay $1,000 as restitution to Chavez for delaying her receipt of $45,000 for approximately two months and $5,000 for approximately 24 months. We further require Stansfield to refund the fee that he received for his representation of Vargas, plus interest from the date of its receipt. *See, e.g., Eriks v. Denver*, 118 Wn.2d 451, 462-63, 824 P.2d 1207 (1992).

### UNANIMITY AND PROPORTIONALITY

¶41 Additionally, when evaluating the board's recommendation, we consider the board's degree of unanimity and the proportionality of the recommended sanction to the misconduct, the so-called *Noble* factors. *Schwimmer*, 153 Wn.2d at 758, 764; *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983). We consider proportionality and uniformity only if raised by the attorney being disciplined. *Trejo*, 163 Wn.2d at 734 (citing *Schwimmer*, 153 Wn.2d at 758). We will depart from the board's recommended sanction if we are persuaded that it is inappropriate either because it is disproportionate to the misconduct or because of a lack of agreement among the members of the board. *Schwimmer*, 153 Wn.2d at 764.

¶42 Although Stansfield has raised the issues of proportionality and uniformity, we need not address them further because we have already concluded we should depart from the board's recommended sanction based on our adoption of the hearing officer's factual findings regarding Stansfield's mental state.

## CONCLUSION

¶43 We hold that the hearing officer and the board were correct in finding that Stansfield violated former RPC 1.2(f) by willfully purporting to represent a person without authority and that he violated former RPC 1.9 by representing parties with adverse interests. Although discerning Stansfield's state of mind is admittedly a close question, substantial evidence supports the hearing officer's findings that Stansfield's state of mind was negligent, rather than knowing. Considering all of the circumstances and evaluating the elements of duty, state of mind, and harm, and after considering mitigating and aggravating factors, we hold that Stansfield shall be sanctioned by receiving two reprimands and that he shall further pay restitution to Chavez in the sum of $1,000 and return the fee of $250 he charged Vargas, plus interest.

C. JOHNSON, SANDERS, OWENS, and STEPHENS, JJ., concur.

¶44 J.M. JOHNSON, J. (dissenting) — Mark Stansfield is a long-time attorney in the small town of Quincy, Washington, where, in his own words, "a triple homicide is rare." Hearing Transcript (HT) at 122. After one such rare occurrence, Stansfield probated the estate of one of the decedents and discussed a possible wrongful death claim with that decedent's widow. He then represented the criminal defendant driver charged with causing the fatalities. He also claimed to represent the impoverished Guatemalan-residing widow of a different decedent for over three months without her consent, even filing a lien for attorney fees

against her husband's estate and thus delaying her receipt of sorely needed insurance proceeds. Because the majority holds Stansfield acted negligently, and not knowingly, and accordingly reduces his penalties, I dissent.

¶45 "Knowledge" is the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA, STANDARDS FOR IMPOSING LAWYER SANCTIONS 7 (1991). This court has found "knowledge" when a lawyer "knew or *should have known* that a conflict existed." *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d 393, 416, 98 P.3d 477 (2004).

¶46 Stansfield knowingly violated former RPC 1.9 (1993) by representing clients with adverse interests. The majority declares, "Stansfield certainly knew or should have known that he was representing two clients for matters arising out of the same tragic auto accident." Majority at 128. In my view, the analysis should end here. However, the majority states Stansfield did not have a " 'conscious awareness' that there could be some consequences to his clients for his actions." *Id.* Knowledge of the possible consequences to his clients is not required. Stansfield clearly had a "conscious awareness" of the "nature of his conduct"—that he was representing opposing parties in matters arising from the same car accident.

¶47 Substantial evidence in the record supports Stansfield acted with knowledge. Although Stansfield testified when he first met with the Vargases, he only *suspected* Miguel Urquilla was involved, this could not be true. Mr. Urquilla's name was on the first page of the charging information the Vargases provided him. Only two weeks separated his active representation of the Urquillas and his meeting with the Vargases. In his representation of the Urquillas, Stansfield compiled police and motor vehicle reports detailing the facts of the accident and wrote letters to the insurance company declaring, "Our preliminary investigation indicates that Mr. Francisco Vargas was 100% at fault for this incident," and "Mr. Francisco Vargas will

probably be convicted of numerous felonies as a result of his actions, and be sentenced to a lengthy prison term." Exs. 7, 29. As noted in my introduction, Stansfield admits "a triple homicide is rare" in Quincy.

¶48 The majority declares, "Stansfield took prompt action to correct his mistake once it came to his attention." Majority at 129. In my view, Stansfield knew of the conflict all along and withdrew only when he realized he was not going to get away with the adverse representation. Stansfield clearly did not intend to represent Vargas only at the arraignment. His fee agreement specified it covered all services and that the $10,000 flat fee that the Vargases paid upfront was nonrefundable.

¶49 After the deputy prosecutor spoke with the "shocked" and "extremely upset" Mrs. Urquilla, the prosecutor called Stansfield's office and asked his assistant if Stansfield was planning to voluntarily withdraw his representation or if she needed to bring a motion. Although Stansfield testified he never received the prosecutor's message, but rather withdrew because he was "uncomfortable" (HT at 318), this seems unlikely. The record supports the Disciplinary Board's finding that Stansfield knowingly violated former RPC 1.9.

¶50 Stansfield also knowingly violated former RPC 1.2(f) (2002) when he represented Mrs. Chavez without her consent. Stansfield does not dispute the hearing officer's and board's finding that "[t]here was never any objective action by Mrs. Chavez that she wanted the Respondent as the attorney or, for that matter, Mrs. Urquilla to represent the Chavez family or the estate of Mr. Chavez." Decision Papers (DP) at 16. He admits he "wouldn't know [Mrs. Chavez] if she walked in here today." HT at 87.

¶51 Stansfield did not even attempt to contact Mrs. Chavez before claiming to represent her husband's estate, although he clearly knew he needed her consent. The letters he sent her did not ask her to confirm she had already retained him as her attorney, but rather asked if she wanted to hire him. Even assuming Mr. Stansfield was

justified in relying on the initial conversation he had had with Mrs. Urquilla, after three months of unanswered correspondence, he knew he did not have Mrs. Chavez's authorization.

¶52 As the majority notes, Stansfield "was concerned that [Mrs.] Urquilla was really trying to get control of the Chavez money and he was concerned about protecting the Chavez funds." Majority at 126. Based on this concern, Stansfield knew he should not have relied on Mrs. Urquilla's statements claiming authorization. Yet he continued to represent Mrs. Chavez without her consent.

¶53 The majority correctly states, " 'We give considerable weight to the hearing officer's findings of fact, especially with regard to the credibility of witnesses, and we will uphold those findings so long as they are supported by "substantial evidence." ' " Majority at 125 (quoting *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 208, 125 P.3d 954 (2006)). Substantial evidence, however, does not support many of the hearing officer's findings regarding Stansfield's mental state. The board properly struck three findings in particular.

¶54 With regard to representing Mrs. Chavez, the hearing officer found, "Respondent's actions fall within the category of 'no good deed goes unpunished' and that Respondent's only motives were to get a good resolution so the families could receive the funds from the insurance company," and "[t]he Respondent, being compassionate by nature, took on the representation of both estates for their respective families." DP at 34.

¶55 Both findings have no support in the record. Filing a lien on Mr. Chavez's estate and refusing to endorse the insurance check until his claim was resolved, thereby intentionally[10] delaying Mrs. Chavez's receipt of much-needed insurance proceeds, do not strike me as compassionate, good deeds. They are bad deeds that should be punished.

---

[10] Stansfield readily admits he intended his attorney's lien to impact the disbursement of the funds from the Chavez estate.

¶56 The board also struck the hearing officer's finding in regard to both RPC violations that "Respondent had nothing but the best intentions in mind when representing any of the parties involved in the Association's Complaint." DP at 21. The record shows Stansfield intended to make the nonrefundable $10,000 fee by representing Mr. Vargas, even though he had already represented Mrs. Urquilla. He previously intended to receive payment for representing Mrs. Chavez as evidenced by his filing a lien against her husband's estate, even though he knew he was not authorized to act as her attorney.

¶57 Stansfield's conduct is a far cry from the majority's example of a negligent act where "a lawyer with no discipline history was in trial and forgot to file a notice of appeal." Majority at 124. Stansfield's conduct was not based on mere oversight. I would hold Stansfield knowingly violated former RPC 1.2(f) and former RPC 1.9 and impose the board's recommended six month suspension. Because the majority holds otherwise, I dissent.

ALEXANDER, C.J., and MADSEN and FAIRHURST, JJ., concur with J.M. JOHNSON, J.