**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Receivership of:<br><br>APPLIED RESTORATION, INC.<br><br>ANDERSEN CONSTRUCTION COMPANY,<br><br>                Appellant,<br><br>v.<br><br>REVITALIZATION PARTNERS, LLC,<br><br>                Respondent. | No. 84320-6-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Andersen Construction Company appeals two separate orders for turnover issued by a court commissioner in favor of receiver Revitalization Partners, LLC, and challenges the superior court's denial of its motion for revision. Andersen also argues the commissioner erred when they disallowed its claims against Applied Restoration, Inc. and entered final judgment in favor of the receiver. Because the record establishes that Andersen repeatedly refused to comply with the court orders pursuant to the receivership statute and because Andersen fails to demonstrate any error arising from the decisions of either the commissioner or judge in this matter, we affirm.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 84320-6-I/2

FACTS

In May 2019, Applied Restoration, Inc. (ARI) and Andersen Construction Company entered into an agreement (subcontract) for ARI to perform work on the construction of the Quil Ceda Creek Casino (project), owned by the Tulalip Tribes of Washington (owner). ARI served as a subcontractor for Andersen, the general contractor on the project. In accordance with the agreement, ARI employed nine to ten laborers per day who worked directly on the project and also subcontracted with third parties (sub-tier subs) who provided further labor and materials for ARI's work on the project. Through March 2020, Andersen paid ARI for the work that it had performed pursuant to the billing process and terms set out in the subcontract and prime contract.[1] On March 31, due to ongoing financial difficulties, ARI assigned all of its assets to Revitalization Partners, LLC and, on April 2, the trial court entered an order appointing Revitalization as the general receiver of ARI's property and assets. At the time of the assignment, ARI had not paid all sub-tier subs for their work on the project, in violation of the subcontract. On April 6, Revitalization contacted Andersen, explained that ARI had been placed into receivership and identified itself as the receiver.[2] Revitalization assured Andersen that it would continue to operate ARI and fulfill its obligations on the project as previously agreed.

---

[1] The subcontract expressly incorporated various terms and provisions set out in the prime contract between Andersen and the owner.

[2] "Receivership" simply means "the case in which the receiver is appointed." RCW 7.60.005(11). A "general receivership" is "a receivership in which a general receiver is appointed" and a "custodial receivership" is "a receivership in which a custodial receiver is appointed." *Id.*

- 2 -

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Thereafter, Andersen stopped paying ARI and did not pay Revitalization for the work performed post-assignment. Revitalization demanded assurance from Andersen that it would pay ARI for the work, but Andersen refused absent certain conditions: "If the Receiver cannot guarantee that it will pay all pre-receivership claims related to this Project, then Andersen cannot issue April's payment, the Receiver must reject the subcontract agreement and Andersen will find another subcontractor." According to Andersen, Revitalization was not entitled to payment from Andersen because the "unequivocal language of the Subcontract between Andersen and ARI . . . control[led] the terms of payment to ARI and/or the Receiver." Revitalization had paid sub-tier subs $42,467.25 for post-assignment work and ARI extended over $200,000.00 on work and materials for the project during that time.

Between May and July 2020, Revitalization filed three motions against Andersen for turnover of the subcontract funds pursuant to RCW 7.60.005(9) and .070. On May 15, Revitalization filed its first motion, seeking $157,342.97, but that motion was denied as the project owner had not yet paid Andersen, accordingly it had neither possession or control of the funds. The statute requires either possession or control of funds as a prerequisite to turnover. RCW 7.60.070. Roughly two weeks later, the owner issued payment to Andersen for work ARI had completed in April 2020. Revitalization then requested confirmation from Andersen that it would pay ARI for post-assignment work but, on June 3, Andersen again refused to do so unless Revitalization guaranteed that it would pay all pre-assignment claims related to the project.

On June 4, Revitalization told Anderson that ARI's employees would not be working on the project that day due to "Andersen's unwillingness to commit to paying [ARI] for the work being done, as well as the completed work." That same day, Andersen forwarded a letter to Revitalization from the owner to demand return of its $113,480.89 payment to Andersen for the work on the project in April. On June 5, Revitalization demanded Andersen turn over the subcontract funds for the May billing and provided notice of another action for turnover, but Andersen refused and, further, remitted the April funds to the owner.

On June 11, Revitalization filed a second motion for turnover for the April billing. On July 7, after reviewing the motion, accompanying declarations, and exhibits, the superior court commissioner granted the motion and ordered Andersen to pay the subcontract funds to Revitalization for both April and May 2020. The order required Andersen to pay Revitalization for labor, materials, and vendor costs directly related to the project and to place the balance of the amount set out in each month's billing into the court registry. Further, the court ordered Andersen to follow the same payment pattern for the month of June, due on August 20. Andersen then filed a motion for reconsideration of the order, but the commissioner rejected Andersen's arguments and denied reconsideration. Subsequently, Andersen filed a motion for revision of the commissioner's denial of reconsideration by a superior court judge. The court denied the motion for revision.

On July 29, as Andersen had not complied with the commissioner's previous turnover order regarding payment for the month of May, Revitalization filed a third motion for turnover. Though Andersen had placed most of the funds

No. 84320-6-I/5

for the May billing into the court registry pending outcome of the motion, the previous order required Anderson pay those funds directly to Revitalization. On November 3, the commissioner granted the third motion for turnover, in part, and ordered the funds for the May billing to be released to Revitalization.[3]

On February 26, 2021, Andersen filed an amended proof of claim wherein it asserted an unsecured debt of $941,444.45 against ARI and Revitalization based on the following: "(i) alleged incomplete work by ARI ($664,146), (ii) cost to repair north exterior ($45,339), (iii) amounts to be retained for subcontractor payments ($18,139.82), (iv) amounts paid by Andersen to subcontractors Salmon Bay and PCI [(Performance Contracting, Inc.)] ($302,098.92), and (v) insurance costs ($13,096.40)." Andersen additionally sought $76,483.24 as reimbursement for its direct payment to PCI. Though the foregoing amounts total $1,119,303.38, Andersen still owed $177,858.93 to Revitalization for work completed post-assignment and sought to offset that amount by reducing the claim to $941,444.45.

On April 21, 2021, Revitalization filed a motion to authorize rejection of the executory contract with Andersen pursuant to RCW 7.60.130. The motion expressly requested that the court authorize Revitalization's rejection of the subcontract between ARI and Andersen. On May 14, the commissioner granted the motion and authorized Revitalization to reject the subcontract.[4]

---

[3] Andersen filed a motion for discretionary review of the July 7 and November 3 orders granting turnover, which this court denied. Ruling Den. Rev., *Andersen Constr. Co., v. Revitalization Partners, LLC,* No. 82096-6-I (Wash. Ct. App. May 7, 2021).

[4] In briefing, Revitalization asserts that Andersen did not seek rejection damages under RCW 7.60.130(2) within the statutorily proscribed timeframe, thus waiving any such recovery on that basis. Andersen has not responded to that contention.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

On February 3, 2022, Revitalization filed an objection to Andersen's claim and sought leave of the court to disallow a portion of the unsecured claim. A hearing on the motion was conducted on March 16, at the conclusion of which the court entered an order disallowing Andersen's claims. Specifically, the order disallowed $1,006,023.09 of Andersen's claim, allowed $113,340.29 as an unsecured claim, and prohibited the $177,858.93 offset sought by Andersen. Andersen was ordered to pay Revitalization that amount due under the subcontract directly. However, despite repeated requests from Revitalization, Andersen did not make the payment and Revitalization filed a motion seeking a contempt finding for Andersen's failure to remit payment. Though the court did not hold Andersen in contempt, it entered an order providing that the remedy for further noncompliance would be to "reduce the obligation to a judgment."

On June 10, 2022, Revitalization filed a motion to enter final judgment against Andersen. The motion was heard on June 27 and, despite filing a written objection to the judgment, Andersen failed to appear for the hearing. The commissioner entered judgment in favor of Revitalization in the amount of $177,858.93.

Andersen timely appealed.

ANALYSIS

I. Procedural Posture and Standard of Review

Andersen first assigns error to the commissioner's orders that granted the receiver's second and third motions for turnover. According to Andersen, under RCW 7.60.070, the orders of turnover for April and May billings were erroneous

because Andersen did not have possession or control over those funds when the turnover was demanded. However, because of the manner by which Andersen has pursued review in this case, neither the commissioner's July 7 order on the second motion for turnover concerning the April billings nor the July 17 denial of Andersen's motion for reconsideration of that order are directly before this court.

On July 7, 2020, the commissioner granted Revitalization's second motion for turnover in part and, on July 17, 2020, denied Andersen's motion for reconsideration of that order. Andersen then filed a motion for revision of the commissioner's July 17 order, but the superior court judge denied that motion. Because Andersen challenges the superior court's denial of revision in its notice of appeal to this court, the commissioner's two previous orders upon which that denial of revision was based are outside the scope of our review. "Once the superior court makes a decision on revision, the appeal is from that decision." *Faciszewski v. Brown*, 187 Wn.2d 308, 313 n.2, 386 P.3d 711 (2016). Accordingly, "this court reviews the superior court's ruling, not the commissioner's." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). The superior court's denial of a motion for revision "constitutes an adoption of the commissioner's decision, and the court is not required to enter separate findings and conclusions." *Id.* We review the denial of a motion for revision for an abuse of discretion, which exists when the court's decision is "exercised on untenable grounds or for untenable reasons, or if its decision was reached applying the wrong legal standard." *River House Dev., Inc. v. Integrus Architecture, P.S.*, 167 Wn. App. 221, 231, 272 P.3d 289 (2012); *Maldonado*, 197 Wn. App. at 789.

Receiverships are an equitable remedy and trial courts are "accorded great flexibility in fashioning relief under [their] equitable powers." *Bero v. Name Intel., Inc.*, 195 Wn. App. 170, 179, 381 P.3d 71 (2016); *Friend v. Friend*, 92 Wn. App. 799, 803, 964 P.2d 1219 (1998). In matters of equity, trial courts have inherent authority beyond that expressly granted by the legislature. *See Allen v. Am. Land Rsch.*, 95 Wn.2d 841, 852, 631 P.2d 930 (1981) ("The superior court's inherent authority to enforce orders and fashion judgments is not dependent on the statutory grant."). Thus, "[w]e review the authority of a trial court to fashion equitable remedies under the abuse of discretion standard." *In re Foreclosure of Liens*, 123 Wn.2d 197, 204, 867 P.2d 605 (1994).

Chapter 7.60 RCW also provides trial courts with broad discretion over receiverships. *Bero*, 195 Wn. App. at 175. For example, courts have discretion to appoint and terminate receivers and to "manage the duration of the extraordinary remedy." *Mony Life Ins. Co. v. Cissne Fam., LLC*, 135 Wn. App. 948, 952, 148 P.3d 1065 (2006); *Bero*, 195 Wn. App. at 178. Once the trial court appoints a receiver, that person becomes an agent of the court and retains "broad powers to manage the receivership property, liquidate assets, and satisfy creditors." *Bero*, 195 Wn. App. at 175.

With these equitable and statutory powers in mind, we review the trial court's rulings regarding the receivership that order turnover, disallow claims, and enter judgment, for an abuse of discretion. Again, an abuse occurs when a decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Mony Life Ins.*, 135 Wn. App. at 952-53 (internal quotation

marks omitted) (quoting *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006)). The trial court's findings of fact are reviewed for substantial evidence, which exists when there is "a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

II.     Turnover Orders

A "[r]eceiver" is a "person appointed by the court as the court's agent, and subject to the court's direction, to take possession of, manage, or dispose of property of a person." RCW 7.60.005(10). Pursuant to RCW 7.60.070, "Upon demand by a receiver . . . any person shall turn over any property over which the receiver has been appointed that is within the possession or control of that person unless otherwise ordered by the court for good cause shown." Property is defined in this chapter as "all right, title, and interests, both legal and equitable, and including any community property interest, in or with respect to any property of a person with respect to which a receiver is appointed, regardless of the manner by which the property has been or is acquired." RCW 7.60.005(9).[5] Further, once a trial court enters an order appointing a receiver, an automatic stay that is applicable to all persons arises of "[a]ny act to obtain possession of estate property from the

---

[5] Andersen argues in its brief that the trial court erred in entering both orders for turnover because "Andersen did not have property belonging to ARI" as defined by the subcontract. Its argument largely relies on the contention that the terms of the subcontract supersede the provisions of the receivership statute, such as RCW 7.60.070 and .110(c). However, as set out in detail herein, Andersen offers no authority in support of this position which is clearly at odds with both the court's equitable powers and general public policy considerations.

No. 84320-6-I/10

receiver, or to interfere with, or exercise control over, estate property." RCW 7.60.110(1)(c).

A. April Billing

The April billing funds were addressed in the order granting the second motion for turnover, the order denying reconsideration of that turnover order, and the superior court's order denying revision of the order denying reconsideration. Though we elect to address the arguments of the parties regarding this assignment of error and go to the original ruling by the commissioner, we note that Andersen offers no argument as to how the judge's order denying revision was an abuse of discretion.

When it granted the second motion for turnover, the trial court found that Andersen was withholding the April billing, which amounted to $113,481.00, and that Andersen's claim for an offset of $272,236.83 against that billing was not appropriate. Andersen was ordered to pay $113,481.00 of the subcontract funds as follows: $84,164.54 to Revitalization for costs directly related to the project and $29,313.46 to be placed in the court registry for the balance of the April billing. Those payments were due on July 15, 2020.

First, Andersen's argument that it did not have any property belonging to Revitalization for the April billing *under the terms of the subcontract* is irrelevant. Andersen offers no authority for its bald assertion that the terms of the subcontract control over those of the receivership statute. Again, under RCW 7.60.006(9), property belonging to the receiver includes "all right, title, and interests, both legal and equitable, and including any community property interest, in or with respect to

- 10 -

No. 84320-6-I/11

any property of a person with respect to which a receiver is appointed, regardless of the manner by which the property has been or is acquired." Because there is no dispute that the work addressed in the April billing was performed, Revitalization, as the receiver, had a right to payment for that work; the funds belonged to Revitalization.

Second, Andersen cites to *United States v. Aubrey*, in support of its argument that the April funds were Tribal property and Andersen never had control of them. 800 F.3d 1115 (9th Cir. 2015). Andersen's reliance on *Aubrey* is misplaced. In that case, the United States was prosecuting a contractor who had contracted directly with a Tribal organization and the dispute concerned federal funds that had been transferred to the Tribal organization. The case is materially distinguishable on those facts alone.

Here, the court's finding that Andersen was in possession or control of the property is supported by substantial evidence. As the commissioner explained after reviewing the correspondence from both the owner and Andersen, it was clear "that Andersen was paid by the [owner] and Andersen took affirmative action to cause the [owner] to cancel payment." This was confirmed by the content and timing of e-mails between the parties, Andersen's own declaration, and the letter from the owner that Andersen forwarded to Revitalization.

Once the owner issued payment to Andersen for work ARI had completed in April, Revitalization requested confirmation from Andersen that it would pay for the post-assignment work. However, on June 3, Andersen refused to do so without express agreement that Revitalization would pay all pre-assignment claims from

- 11 -

the sub-tier subs. On June 4, in response to this refusal, Revitalization told Anderson that its employees would not be working on the project that day. Andersen responded by accusing Revitalization of breaching the subcontract and, later that same day, forwarded a letter to Revitalization from the owner that demanded return of the April billing funds from Andersen. The commissioner expressly found the timing of the e-mails and the word choice in the owner's letter stating, "[i]t has come to the [owner's] attention . . .," established that Andersen had possession of the April funds, even if temporarily, and withheld them. On June 5, Revitalization demanded Andersen turn over the funds, but Andersen refused and instead returned them to the owner.

Pursuant to RCW 7.60.070, Andersen was required to "turn over any property over which the receiver ha[d] been appointed that [was] within [its] possession or control." Because substantial evidence supports the trial court's finding that "Andersen had possession of the funds owed to ARI" and "withheld those funds," this finding was proper. Moreover, as Revitalization correctly asserts in briefing, "If a party could simply avoid the consequences of a receivership by transferring estate property, the statute would be useless in effectuating its goals— achieving equity for all creditors."

Accordingly, the commissioner's order on turnover as to the April billing was not an abuse of discretion and, therefore, the superior court did not abuse its discretion in denying Andersen's motion for revision of the commissioner's order denying reconsideration of the order for turnover.

No. 84320-6-I/13

B. May Billing

Regarding the order granting the third motion for turnover, Andersen again argues that the terms of the subcontract are controlling and asserts that it never had possession or control of the May billing funds. Neither argument holds merit; the former lacks any supporting authority and the latter is refuted by the fact the Andersen placed $81,179.70 into the court registry for the May billing, at least a rebuttable demonstration of control over the funds.[6] The commissioner's order granting the second motion for turnover set out the specific procedure Andersen was to follow for the funds relating to the April and May billings. When Andersen failed to comply with the court's requirements as to the May billing, the commissioner granted the third motion for turnover, which ordered the release of funds that Andersen had placed into the court registry for that billing.

Andersen further argues that both turnover orders were erroneous "due to a bona fide dispute over the funds." We disagree. Under RCW 7.60.070, Andersen was required to turn over the property to Revitalization "unless there exist[ed] a bona fide dispute with respect to the existence or nature of the receiver's interest in the property, in which case turnover shall be sought by means of an action under RCW 7.60.160." Andersen cites to the commissioner's order granting the receiver's second motion for turnover and argues that, because "portions of the funds related to the April Billing were to be placed in the court registry," RCW

---

[6] While Andersen asserts that these funds did not constitute the May billing because Andersen paid them out of pocket without first being paid by the owner, that alone does not establish an abuse of discretion on the part of the trial court. Rather, this order was a clear example of the trial court exercising its equitable powers and, considering Andersen's continued refusal to abide by the court's previous orders under the receivership statute, the trial court's order was not beyond its authority. *See Friend*, 92 Wn. App. at 803-04.

- 13 -

7.60.160 should have governed the action. However, Andersen fails to understand that the funds that it was ordered to pay directly to the receiver, $84,164.54 for demonstrable costs for labor, materials, and vendor costs related to the project, were not disputed. As there was no bona fide dispute, there was no abuse of the discretion by the commissioner or the superior court on revision.

Andersen next contends that the turnover orders were erroneous because they conflicted with the court's previous orders in the "Foushee matter." That matter, which involved ARI and a different owner, is distinguishable and immaterial. While Andersen argues that the facts are "nearly identical," it ignores the key distinction that Foushee had neither control nor possession of the funds the receiver demanded but, as established here, Andersen did. More critically, despite Andersen's argument to the contrary, a different ruling based on distinct facts in a tangentially related matter involving the same receivership does not trigger application of the law of the case doctrine. "Except in the case of jury instructions, the law of the case doctrine requires a prior appellate court decision in the same case." *In re Est. of Jones*, 170 Wn. App. 594, 605, 287 P.3d 610 (2012). Because the commissioner's orders in the Foushee matter constitute neither jury instructions nor the decision of an appellate court, the rule of the case doctrine is inapplicable here.

III. Rejection of Andersen's Claims

Andersen avers the trial court erred in rejecting its claims and ordering it to pay the subcontract balance to the receiver. Specifically, Andersen challenges the

rejection of claims for the "retention balance ($18,139.81),"[7] costs it asserted were required to repair ARI's "defective work ($45,339.00)," and costs of completing ARI's "abandoned work ($664,146.00)."

The receivership statute is instructive and controlling[8] here; according to the relevant provisions, Andersen had 30 days following Revitalization's rejection of the subcontract to file a claim for damages on that basis. A general receiver may "reject any executory contract or unexpired lease of the person over whose property the receiver is appointed upon order of the court following notice to the other party to the contract or lease upon notice and a hearing." RCW 7.60.130(1). Such a rejection "shall be treated as a breach of the contract or lease occurring immediately prior to the receiver's appointment" and any claim of a party to the contract or lease, based on the receiver's rejection of it, "shall be served upon the receiver in the manner provided for by RCW 7.60.210 within thirty days following the rejection." RCW 7.60.130(2). Because Andersen failed to file a claim for damages within the 30 days after the court permitted Revitalization to reject the subcontract, those claims were properly barred.

---

[7] In construction contracts, "retainage" refers to the percentage that the owner or general contractor may withhold from each progress payment to the contractor or subcontractor until final completion of the project. Steven Walt & Emily L. Sherwin, *Contribution Arguments in Commercial Law*, 42 EMORY L.J. 897, 907-08 (1993).
Andersen explicitly asserts that it is entitled to the "reimbursement" of $18,138.81 for the retention of three sub-tier subs that Revitalization had not paid, however, it fails to provide any statutory basis that would entitle it to such a "reimbursement."

[8] The majority of Andersen's argument, once again, focuses on the terms of the subcontract rather than those found in the receivership statute and argues, without authority, that the former is controlling. The commissioner correctly disagreed.

No. 84320-6-I/16

Andersen next challenges the commissioner's order disallowing claims for completion damages[9] based on its determination that Andersen anticipatorily breached the subcontract. According to Andersen, it did not anticipatorily breach the subcontract and ARI breached the subcontract first by abandoning the work.

An anticipatory breach is a "'positive statement or action by the promisor indicating distinctly and unequivocally that [they] either will not or cannot substantially perform any of [their] contractual obligations.'" *Olsen Media v. Energy Scis., Inc.*, 32 Wn. App. 579, 585, 648 P.2d 493 (1982) (quoting *Lovric v. Dunatov*, 18 Wn. App. 274, 282, 567 P.2d 678 (1977)). "A party's intent not to perform may not be implied from doubtful and indefinite statements that performance may or may not take place." *Wallace Real Est. Inv., Inc. v. Groves*, 124 Wn.2d 881, 898, 881 P.2d 1010 (1994). However, when a party makes repeated conditional threats to withhold payment due under a contract, such conduct may qualify as repudiation of the contract and an anticipatory breach that justifies the other party walking away. *See CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 620, 821 P.2d 63 (1991).

Here, Andersen expressly, directly, and repeatedly told Revitalization that it would not provide further payments unless Revitalization guaranteed it would pay the "outstanding amounts owed" to the sub-tier subs under the terms of the subcontract. Although Revitalization explained to Andersen that it was prohibited

---

[9] Completion damages are those "incurred to complete the contract following the owner's just termination of the contract for default or the contractor's wrongful repudiation of the contract or wrongful abandonment of the project." 6 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR ON CONSTRUCTION LAW § 19:78 (2023). Typically, they are measured by "the reasonable cost to complete the contract in conformance with its terms, less unpaid contract funds." *Id.*

from doing so by the plain language of the receivership statute, Andersen would not yield and reiterated its refusal to pay the funds unless Revitalization satisfied its condition. In an e-mail to Revitalization, Andersen explicitly stated that "[i]f the Receiver cannot guarantee that it will pay all pre-receivership claims related to this Project, then Andersen cannot issue April's payment, the Receiver must reject the subcontract agreement and Andersen will find another subcontractor." According to Andersen, Revitalization was not entitled to payment from Andersen as the "unequivocal language of the Subcontract between Andersen and ARI . . . control[led] the terms of payment to ARI and/or the Receiver."[10]

Based on its continuous threats and, as the commissioner noted, the fact that "[t]hroughout this matter Andersen has been obstructive to the receivership process," we conclude that substantial evidence supports the commissioner's implicit finding that Andersen anticipatorily breached the subcontract before the court granted Revitalization permission to reject it. Because Andersen anticipatorily breached the subcontract and was thus not entitled to completion damages, the trial court did not err in disallowing this portion of its claim.

Andersen further contends that the trial court erred by ordering payment of the "subcontract balance," i.e., the $177,858.93 that Andersen sought as an

---

[10] As Andersen had posted a payment bond on the project, it faced liability under the subcontract in the event that Revitalization failed to pay its sub-tier subs in full. In order to avoid its own liability under the terms of the subcontract, Andersen chose to pay the sub-tier subs pursuant to the subcontract and in violation of the receivership statute.

It is unclear whether compliance with the requirements of the receivership statute would constitute a defense to any claims against Andersen for breach of the payment terms set out in the contract with the project owner, and the parties have made no such argument. In other words, while Andersen insists that it had no choice but to withhold payment to Revitalization, Andersen may have made a strategic choice to prioritize the subcontract above the receivership statute.

- 17 -

offset.[11]  Strangely, Andersen asserts there is "no evidence in the record" that the subcontract balance was owed to Revitalization.   However, at the contempt hearing on Andersen's failure to comply with its payment obligations, Andersen confirmed that it sought to "offset" the $177,858.93 from the amount it owed to Revitalization because it had already paid the subcontractor PCI in full.  The trial court rejected Andersen's attempted offset and explained that the payment to the subcontractor PCI was wrongful.  The court concluded that Andersen was only entitled to an offset in an amount equal to a pro-rata share.  In the order disallowing Andersen's claims, the court reiterated that "Andersen paid the subcontractor (wrongfully) PCI in full.  PCI should only have pro-rata share as other unsecured creditors will.  Andersen is entitled to PCI's pro-rata share once that pro-rata share is determined."   Accordingly, the trial court prohibited "the offset sought by Andersen in its [c]laim in the amount of $177,858.93" and required Andersen to pay that amount directly to Revitalization.

Under RCW 7.60.210, the submission of all claims in general receiverships "arising prior to the receiver's appointment, must be served in accordance with this chapter, and any claim not so filed is barred from participating in any distribution to creditors in any general receivership."  RCW 7.60.230 provides the priorities for distribution of payment to creditors for the allowed claims in a general receivership. Pursuant to the statutory priorities, creditors with general unsecured claims are paid on a pro-rata basis after all other claims have been distributed.   RCW

---

[11] Again, Andersen relies on its position that it did not anticipatorily breach the subcontract and insists that Revitalization abandoned the project.  As we have explained, this argument is belied by the record.

- 18 -

7.60.230(1)(h). Because Andersen's claim is unsecured and does not fall within any exception to the priority scheme, Andersen shall receive distribution for that claim on a pro-rata basis along with any other unsecured creditors. Andersen chose to pay its subcontractors for claims that arose before ARI was placed into receivership and sought reimbursement of those payments in full as an offset. Its arguments on appeal are as unpersuasive as they were in the trial court; Andersen cannot circumvent the receivership statute and, though it paid its subcontractors in full, it is only entitled to a pro-rata distribution of its claim.

Andersen's final challenge to the award of the subcontract balance to Revitalization is the assertion that it is barred by the law of the case doctrine because it conflicts with the commissioner's turnover order. As already established, that doctrine has no bearing in this context.

III.    Entry of Judgment against Andersen

When Andersen failed to comply with the court's order on the turnover motions, Revitalization moved for a finding of contempt. While the court declined to find that Andersen was in contempt, it expressly noted that a remedy for Andersen's continued failure to comply could be entry of judgment. After payment had still not been made, Revitalization moved for entry of judgment, to which Andersen objected in writing. However, despite filing formal opposition to Revitalization's action, Andersen failed to appear for the hearing on the motion and the trial court entered judgment in favor of Revitalization.

Andersen argues that the trial court erred in entering judgment against it for the same reasons it asserts that the court erred with regard to the order disallowing

No. 84320-6-I/20

its claims. These arguments have been addressed herein and need not be repeated. Andersen further avers that the court erred by refusing the request in its written opposition to "enter express findings of fact linking the judgment amount to documents in the record." Revitalization contends that the trial court did not err as to the form of the judgment because the trial court had already addressed the issues, did not require additional proceedings, and made oral findings of fact.

As it did in its written objection to the entry of judgment, Andersen cites *Pacific Marine Insurance Co. v. Department of Revenue*, 181 Wn. App. 730, 737, 329 P.3d 101 (2014) in its opening brief and claims the case stands for the proposition Andersen characterized, in both its pleading in the trial court and appellate briefing, as an "[a]ppellate court cannot affirm a superior court's entry of judgment if the grounds are not supported by the court record." No such rule statement lives in that opinion. In *Pacific Marine*, the court simply provided the common rule that an appellate court "may affirm the superior court's summary judgment decision on any ground supported by the record." *Id.*

Beyond the mischaracterization of the language in *Pacific Marine*, Andersen cites no authority for its assertion that the trial court was required to provide explicit written findings of fact. This court need not consider arguments for which a party has not cited authority. *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011). Moreover, the trial court made oral findings. The commissioner found that awarding Andersen what it sought would have provided Andersen an amount close to its pre-filing, rather than post-filing, claim. The trial court clearly stated, "That's not appropriate." Andersen does not

No. 84320-6-I/21

challenge the court's oral findings. Unchallenged findings are treated as verities on appeal. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993). Absent any authority to the contrary, the trial court did not err by not entering written findings of fact in this case.

IV.     Attorney Fees

Andersen requests attorney fees, costs, and expenses incurred herein pursuant to article 11.5 of the subcontract which provides that the prevailing party shall be entitled to such an award. Because Andersen has not prevailed, we reject its request for fees and costs.

Revitalization also seeks an award of attorney fees pursuant to RCW 7.60.080 and RAP 18.9(a). Under RAP 18.9(a), this court may order a party who files a frivolous appeal "'to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply or to pay sanctions to the court.'" *Kinney v. Cook*, 150 Wn. App. 187, 195, 208 P.3d 1 (2009) (quoting RAP 18.9(a)). Such sanctions include "'an award of attorney fees and costs to the opposing party.'" *Id.* (quoting *Yurtis v. Phipps*, 143 Wn. App. 680, 696, 181 P.3d 849 (2008)). "[A]n appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal." *Streater v. White*, 26 Wn. App. 430, 435, 613 P.2d 187 (1980). While we reject Andersen's arguments, they were not frivolous. Accordingly, we decline to award fees as a sanction.

Revitalization further asserts Andersen's repeated opposition to the cooperation required under RCW 7.60.080 resulted in frivolous litigation and

- 21 -

No. 84320-6-I/22

excessive legal fees.  However, the plain language of the statute is devoid of any mention of attorney fees and we similarly decline to award them on that proffered basis.

Affirmed.

Hazelrigg, ACJ

WE CONCUR:

Dwyer, J.                    Bowman, J